Kenneth WOOD, et al., Plaintiffs,

v.

GENERAL TEAMSTERS UNION LOCAL 406, et al., Defendants.

Harry HIGHT, et al., Plaintiffs,

v.

GENERAL TEAMSTERS UNION LOCAL 406, et al., Defendants.

Nos. G80–742 CA, G83–727 CA.

United States District Court, W.D. Michigan, S.D.

Feb. 28, 1985.

Dennis C. Kolenda and Joseph J. Vogan, Varnum, Riddering, Wierengo & Christenson, Grand Rapids, Mich., for plaintiffs.

Gordon J. Quist and William H. Fallon, Miller, Johnson, Snell & Cummiskey, Grand Rapids, Mich., for Kroger.

Edward M. Smith and H. Rhett Pinsky, Pinsky, Smith & Soet, Grand Rapids, Mich., for General Teamsters Local 406.

Terrence V. Page, Clark, Hardy, Lewis, Pollard & Page, Birmingham, Mich., for Hamady Bros. Food Markets.

## OPINION

BENJAMIN F. GIBSON, District Judge.

In 1980, the Kroger Company began pulling its business operations out of the western Michigan area. As part of that pullout, it ceased operating a local warehouse and transferred the warehouse assets to Hamady Brothers Food Markets. Hamady continued to operate the warehouse as a food distribution center but reduced the level of operations and, consequently, the number of employees. Although Hamady hired solely from the Kroger workforce, it hired only one-half of the Kroger employees and did not hire those employees by seniority.

Plaintiffs, a group which includes some employees not hired by Hamady and others who were hired but suffered a loss in wages and benefits, brought this suit against the Kroger Company, Hamady Bros., and the General Teamsters Union Local No. 406, the bargaining representative for the Kroger employees and later for the Hamady employees. Plaintiffs claim that: 1) Kroger was obligated by a "successors and assigns" clause of its labor contract to require, as a condition of the sale of assets, that Hamady assume the collective bargaining agreement; 2) that Hamady was obligated to accept the collective bargaining agreement; and 3) that Local 406 breached its duty of fair representation to plaintiffs by failing, before and during the arbitration ultimately held to resolve these issues, to represent adequately their interests. The Court bifurcated the trial, trying first the issues of liability. The case on damages has not yet been tried.

After a six week trial on liability, the jury returned a verdict in favor of plaintiffs, against Kroger and Local 406.[1] Answering the interrogatories of the special verdict form supplied to them, the jury found that the Union violated its duty of fair representation to the plaintiffs by conduct occurring before and during the arbitration. It found that the Union's violation of its duty had undermined the integrity of the arbitration process. Having thus decided that the arbitration process was tainted, the jury went on to resolve the issue that had been before the arbitrator, whether Kroger had violated the successors and assigns clause of the collective bargaining agreement. The jury found that Kroger had violated that clause and had thus breached the collective bargaining agreement.

Kroger and Local 406 have filed motions for a new trial and, in the alternative, for a judgment notwithstanding the verdict. As discussed below, the motions are denied.

### I. MOTION FOR A JUDGMENT NOTWITHSTANDING THE VERDICT

The jury was asked to answer seven interrogatories regarding the liability of Kro-

---

1. At that point, Hamady Bros. was no longer a part of the case. The Court granted Hamady's motion to dismiss at the close of plaintiffs' proofs. *Wood v. International Brotherhood of Teamsters*, Nos. G80–742 and G83–727, slip op. (W.D.Mich. Sept. 25, 1984).

ger and of Local 406. It responded to each question in favor of plaintiffs. Kroger and the Union argue that there is insufficient evidence to support the jury's response to any of the questions.

■ A judgment notwithstanding the verdict should be granted only when the evidence is such that there can be but one reasonable conclusion as to the proper verdict. It should not be granted when there is a conflict in the evidence. Credibility of evidence is not to be considered. In sum, if there is sufficient evidence to raise a question of fact for the jury, JNOV is improper. *National Polymer Products v. Borg-Warner Corp.*, 660 F.2d 171, 178 (6th Cir.1981). The Court finds, under this standard, that there is sufficient evidence to support each finding of the jury.

A. Union's Breach of its Duty Apart from the Arbitration.

1. *Duty with respect to Hamady.*

In Question 1.A. of the special verdict form, the jury was asked:

Did the Union violate its duty of fair representation by its conduct apart from the arbitration hearing with respect to the claims against Hamady?

The jury answered "yes." [2]

■ The Court finds that there is sufficient evidence of record upon which the jury could have based this conclusion.[3] Plaintiffs attempted at trial to show that the Union breached its duty in two respects: first, the Union failed to quickly and forcefully pursue whatever legal rights it had against Hamady and, second, it failed to fairly represent the desires of its

membership when it negotiated a new contract with Hamady. A good deal of evidence was presented regarding the care, or lack of care, with which the Union and its counsel investigated whether they had any legal rights against Hamady. The Union ultimately concluded that it had no legal recourse and, instead, would have to bargain a new contract. Testimony revealed that the Local began negotiations with Hamady without notice to the Kroger employees. There was evidence from which the jury could have inferred that the Union meant to exclude certain Kroger employees from the bargaining team. Although testimony was conflicting, the jury could also have concluded that the Union ignored the bargaining unit's concern over seniority rights and dropped its demand that Hamady hire by seniority early in the bargaining process. Further, testimony was elicited from which the jury could have inferred that the reason the Union dropped the seniority demand was because it was more interested in guarding its pension fund. Thus, the Court finds sufficient evidence to support the jury's answer to Question 1.A.

■ *Shamblin v. General Motors Corp.*, 743 F.2d 436 (6th Cir.1984), cited by the Union, is not to the contrary. In *Shamblin*, the court held that a union did not breach its duty of fair representation by failing to secure, through collective bargaining negotiations, retroactive seniority for a group of employees. Both *Shamblin* and the case at issue grew out of circumstances where unions had to decide whether the desires of one group of employees were consistent with the good of the bar-

---

2. With respect to Question 1.A., the Union argues that, if the Union's breach of duty with respect to the employee's claims against Hamady is actionable at all, it is actionable only by Hamady employees. The Court rejects this argument for two reasons. First, until the Kroger warehouse closed on October 18, 1980, the union owed a duty of fair representation to all the Kroger employees. The plaintiffs have alleged that the duty included the obligation to persuade Hamady to accept the Kroger contract or to convince Kroger to require Hamady to accept the contract. Second, some plaintiffs in this case were in fact employees of Hamady and

thus able to press the issue even under the Union's theory.

3. Although no single act may have itself constituted a breach of the Union's duty of fair representation, the jury was instructed that they were to weigh the evidence as a whole in deciding whether the duty had been breached. Jury Instruction No. 17. *See Castaneda v. Dura-Vent Corp.*, 648 F.2d 612, 618 (9th Cir.1981); *Smith v. Hussmann Refrigerator Co.*, 619 F.2d 1229, 1243 (8th Cir.), *cert. denied,* 449 U.S. 839, 101 S.Ct. 116, 66 L.Ed.2d 46 (1980).

gaining unit as a whole. As noted in *Shamblin,* the duty of fair representation does not prevent a union from making a good faith choice between the needs and desires of one employee group and what it perceives to be the needs of the entire bargaining unit. Indeed, a union has great discretion in deciding how to handle such conflicts. Yet, there is one basic limitation. The union may not decide which claims to pursue for reasons that are "arbitrary, discriminatory, or in bad faith." *Ruzicka v. General Motors Corp.,* 523 F.2d 306, 309 (6th Cir.1975), *cert. denied,* —— U.S. ——, 104 S.Ct. 424, 78 L.Ed.2d 359 (1983). It does not appear that the Sixth Circuit intended, in *Shamblin,* to overrule this basic precept.

Looking at the evidence as a whole and resolving credibility questions in favor of plaintiffs, the Court concludes that there was sufficient evidence from which the jury could have inferred that the union in this case pursued a course contrary to the interests of plaintiffs for reasons that were either arbitrary, discriminatory, or in bad faith. To prove that the Union's conduct was arbitrary, plaintiffs presented evidence that the Union failed to move to protect their interests during the time period when the transfer of the warehouse was being contemplated by Kroger. They also elicited testimony suggesting that the Local subsequently failed to actively pursue any means of recourse against Kroger or Hamady until the plaintiffs obtained their own lawyer and began seeking legal remedies themselves. Plaintiffs also presented evidence of a discriminatory motive or bad faith. Testimony regarding the tensions that developed between the Local and the plaintiffs was, in many cases, conflicting. Among other things, the jury could have concluded that the Union purposefully excluded one plaintiff who was a union steward from the team that negotiated the Hamady contract, that the Union denied plaintiffs the opportunity to speak at union meetings, that union members turned on lawn sprinklers to douse plaintiffs while they were picketing the union hall, and that the Secretary-Treasurer of the Union characterized plaintiffs to a news reporter as employees with bad work records.

In Instruction No. 14, the Court carefully explained to the jurors the meanings of the words "arbitrary, discriminatory, and in bad faith."[4] The Jury was also instructed that "the union does not violate its duty of fair representation because it has refused to take some action requested by one of its members or because it has made a mistake" and that "a union is afforded a wide range of reasonableness and the union's representation is not expected to be error free."[5] The Court can only conclude that

**4.** Instruction No. 14 read as follows:

A union breaches its duty of fair representation when the union's conduct is arbitrary, discriminatory, or in bad faith. I will explain to you the meaning of each of these terms.

To act arbitrarily means to act perfunctorily and without heed or regard as to the merits of a particular matter. To act in a perfunctory manner is to act in a mechanical, indifferent, careless, and superficial way. Arbitrary also means not governed by principle, but acting according to preference, notion, whim, or caprice. Arbitrary action is unreasonable action taken without consideration and in disregard of the facts and circumstances.

Action is not arbitrary when exercised reasonably, or according to judgment or reason as dictated by legitimate interests of the union and its members. Neither carelessness, inadvertence, mere negligence, nor errors in judgment constitute arbitrary conduct.

To act discriminatorily means to act unfairly as to one person or group of persons as compared with others similarly situated. In the context of this claim, the union has breached its duty of fair representation only if it discriminated against plaintiffs in a hostile or invidious manner.

To act in bad faith is to act with improper intent, motive, or purpose. Bad faith encompasses fraud, dishonesty, and other intentionally misleading conduct. Proof that a union may have acted negligently or exercised poor judgment is not enough to support a claim of unfair representation.

**5.** Instruction No. 13 read as follows:

The law provides that a union, which is the exclusive bargaining representative of a defined group of employees, has a statutory duty to fairly represent those employees in enforcing a collective bargaining agreement which governs the terms and conditions of their employment. This "duty of fair representation" extends to the processing of a grievance

the jury faithfully applied these instructions in deciding that the conduct proven at trial was indeed arbitrary, discriminatory, or in bad faith.

### 2. *Duty with respect to Kroger.*

■ In Question 1.B. of the special verdict form, the jury was asked:

> Did the Union violate its duty of fair representation by its conduct apart from the arbitration hearing with respect to the claims against Kroger?

The jury answered "yes."

Again, the Court finds that there is sufficient evidence upon which the jury could have based this conclusion. Evidence was presented suggesting that the Local failed to press Kroger to make accepting the collective bargaining agreement a term of its sale of the warehouse to Hamady. Similarly, there was evidence that the Union failed to pursue quickly its contractual rights by filing a grievance against Kroger. When the plaintiffs in this case sought to obtain a temporary restraining order to prevent the transfer of ownership of the warehouse, the Local opposed their motion. Although the Union presented testimony in the course of the trial detailing its reasons for each of its actions, the Court cannot decide as a matter of law that these reasons negate the claimed breach of the duty of fair representation. Rather, it was for the jury to determine whether the Union's conduct, as a whole, amounted to a breach of that duty.

### B. Union's Breach of its Duty During the Arbitration.

■ In question 2.A. of the special verdict form, the jury was asked:

> Did the Union violate its duty of fair representation by its conduct during and related to the arbitration hearing with respect to the claims against Hamady?

The jury answered "yes." In question 2.B., the jury was asked:

> Did the Union violate its duty of fair representation by its conduct during and related to the arbitration hearing with respect to claims against Kroger?

The jury answered "yes."

The record contains sufficient evidence to support the jury's findings that the Union violated its duty of fair representation during the arbitration hearing. Admitted as exhibits were the entire transcripts of the four days of arbitration hearings held in this case. In addition, the parties introduced as separate exhibits those portions of the transcript that they particularly wanted to bring to the attention of the jury. Among the events detailed in the transcript are instances where the Union attorney attempted to impeach witnesses called by the plaintiffs and where he objected to evidence offered by the plaintiffs. At one point, the Union offered into evidence a file which contained a letter from the Union attorney advising the Union that the claims against Hamady had no chance of success and the claims against Kroger had only a fifty percent chance. Further, there was evidence that the Union attorney was uncertain as to the specific language of the successors and assigns clause of the Kroger contract.

The Union's argument that there were reasons for each action that it took during the course of the arbitration is not relevant

---

through the initial stages of the grievance procedure and also extends to the union's representation during arbitration. The duty also applies when a union undertakes to negotiate a contract on behalf of a defined group of employees.

Generally speaking, the union does not violate its duty of fair representation because it has refused to take some action requested by one of its members or because it has made a mistake. A union is afforded a wide range of reasonableness and the union's representation is not expected to be error free.

At the same time, the union's discretion is not without limits. The doctrine of fair representation includes a statutory obligation to serve the interests of all members in a manner that is not arbitrary, discriminatory, or in bad faith.

The union has the authority to take action which it believes to be in the best interest of the group as a whole, even if that action is to the disadvantage of some individual members, subject always to the duty to avoid conduct that is arbitrary, discriminatory, or in bad faith.

to the Court's decision on the judgment notwithstanding the verdict. The Union had the opportunity at trial to convince the jury that it took the actions that it did for reasons that were not arbitrary, discriminatory, or in bad faith. The Court is not at this point sitting as a trier of fact. Instead, it must determine whether there was sufficient evidence upon which the jury could have based its conclusion that the Union breached its duty. Based on the above cited evidence, the Court finds that there is sufficient evidence of record to support the jury's conclusion.

■ The Court is not persuaded by defendants' argument that there can be no breach of the duty of fair representation because plaintiffs had their own lawyer at the arbitration hearing. The defendants suggest that, if the Union lawyer failed to perform adequately at the arbitration hearing, the plaintiffs' own lawyer could have remedied his neglect. Plaintiffs' theory in this case, however, was not that the Union *failed* to act in plaintiffs' behalf at the arbitration. Rather, their theory is that the Union attorney undermined their case by *affirmative* acts such as objecting to their evidence and impeaching their witnesses. The Court does not see how the presence of plaintiff's own counsel could remedy the kind of breach alleged in this case. The presence of plaintiffs' counsel at the arbitration was one factor before the jury for consideration. It is not itself dispositive on the question whether the Union breached its duty.

■ Nor is the Court persuaded by defendant's argument that there can be no breach because the arbitration occurred under order of the Court. Defendants cite no legal authority for the proposition that plaintiffs waived their right to challenge the validity of the arbitration by failing to come to this Court for injunctive relief during the arbitration hearing itself. The Court will not assume such a waiver.

The Union objects particularly to the jury's answer to Question 2.A., finding that the duty of fair representation was breached with respect to the claims against Hamady. The argument it advances has some initial appeal. The Union notes that, at all times that the contractual claim against Hamady was being pursued through arbitration, all parties recognized that it had merit only if Hamady was bound to assume the Kroger collective bargaining agreement. The Union was advised in September of 1980 by its counsel that, based on his understanding of the law, there was no viable claim against Hamady. This Court determined in September of 1984 that the claim against Hamady had no merit. *Wood v. International Brotherhood of Teamsters,* slip op. (W.D.Mich., Sept. 25, 1984). How then, the Union asks, can the jury find that the Union breached its duty of fair representation by failing to pursue a nonmeritorious claim?

Before answering that question, the Court notes that this is not a case where plaintiffs asked the union to pursue a frivolous claim. As the Court stated in its opinion granting the motion to dismiss, the case law establishing when a new employer is or is not bound by the previous employer's contract gives no easy answers. *Id.* at 13. Rather, the courts must closely analyze the facts of each case. In 1980, when the Union decided whether to pursue vigorously its claim against Hamady, the case law was even less clear than it is today.

■ The answer to the Union's question is that the Union was obligated to *fairly* represent plaintiffs and to treat their concerns in a manner that was not arbitrary, discriminatory, or in bad faith. In determining whether the Union treated plaintiffs fairly, neither the Court nor the jury should apply hindsight to decide whether or not a claim was meritorious. Instead, the issue is whether, under the circumstances as they existed at the time, the Union treated plaintiffs' grievance against Hamady fairly. The jury concluded that the Union made the decision not to pursue vigorously the claims against Hamady in a manner that was arbitrary, discriminatory, or in bad faith. Based on the evidence summarized above, the Court

finds that the jury's conclusion is supported by substantial evidence.

### C. Serious Undermining of the Arbitration Process.

In Question 3.A., the jury was asked: If your answer to Question 2A was "yes," did such violation seriously undermine the integrity of the arbitration process as that process related to the claims against Hamady?

The jury answered "yes." In Question 3.B., the jury was asked:

> If your answer to Question 2B was "yes," did such violation seriously undermine the integrity of the arbitration process as that process related to the claims against Kroger?

The jury answered "yes."

The Union and Kroger both argue that the jury's verdict must be overturned because there is no direct evidence that the arbitration was tainted. Defendants characterize plaintiffs' case as one built on speculation. Plaintiffs, they argue, have merely asked the jury to speculate on how the results of the arbitration might have been different; they have not offered any direct proof that the arbitration was undermined.

█ As defendants point out, arbitration awards deserve great deference. Courts

> should not undertake to review the merits of arbitration awards but should defer to the tribunal chosen by the parties finally to settle their disputes. Otherwise, "plenary review by a court of the merits would make meaningless the provisions that the arbitrator's decision is final, for in reality it would almost never be final."

*Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 599, 80 S.Ct. 1358, 1362, 4 L.Ed.2d 1424 ... (1960).

*Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 563, 96 S.Ct. 1048, 1055, 47 L.Ed.2d 231 (1976).

█ The burden of proving that an arbitration award should be overturned is high, even in a case like that at bar, where plaintiffs urge that the union's violation of its duty of fair representation tainted the arbitration process. In *Hines,* the Supreme Court held that, under certain circumstances, a union's breach of its duty of fair representation leads to an exception to the general rule of finality of arbitration awards. The Court held that the union's breach of its duty

> relieves the employee of an express or implied requirement that disputes be settled through contractual grievance procedures; if it *seriously undermines* the integrity of the arbitral process the union's breach also removes the bar of the finality provisions of the contract.

*Id.* at 567, 96 S.Ct. at 1057 (emphasis supplied). Thus, in addition to proving that the Union breached its duty of fair representation at the arbitration hearing by conduct that was arbitrary, discriminatory, or in bad faith, plaintiffs must show that the breach was such that the arbitration process was seriously undermined.

The Court instructed the jury that they would have to find that the arbitration process was seriously undermined in order to overturn the decision of the arbitrator. Instruction No. 19 explained that, to show that the Union's breach seriously undermined the integrity of the arbitration process, "the plaintiffs must show that the arbitration process was seriously flawed and that the arbitration fundamentally malfunctioned in a way that denied the plaintiffs a fair and adequate hearing." Thus, when applying the law to the facts, the jury applied a strict standard.

Kroger and the Union, in effect, argue that the Court should impose a higher standard and conclude as a matter of law that there was insufficient evidence to support the jury's verdict. Defendants argue that plaintiffs must produce *direct evidence* to show that the Union conduct *caused* the arbitrator to decide as he did. It is not clear how the defendants define "direct" evidence, but they appear to argue that the verdict cannot stand because of the plaintiffs' reliance on two kinds of evidence. First, they note that plaintiffs introduced

evidence of events that occurred at the arbitration and left to the jury to infer that these events caused the arbitrator to decide as he did. Defendants argue that plaintiffs' case cannot be based on this sort of circumstantial evidence. Second, they argue that a verdict cannot be based upon the expert testimony offered by plaintiffs to describe how a hypothetical arbitrator would respond to the conduct of the Union. The Court rejects these arguments.

Although the burden of proving that the arbitration process was undermined is high, the Court will not place an insurmountable burden on plaintiffs. One of plaintiffs' theories in this case was that the Union representatives signaled the arbitrator by their conduct in the hearing that they did not, in fact, support plaintiffs' claims. Plaintiffs argued to the jury that, if the arbitrator knew that the Union was only going through the motions of the arbitration hearing, and only begrudgingly asserting the claims of plaintiffs, the arbitrator would be inclined to resolve the case against plaintiffs. An expert presented by plaintiffs as well as one presented by defendants, both experienced arbitrators, testified that it would be conceivable that an arbitrator would follow such "signals" in deciding a case. Given this as plaintiffs' theory, the Court must ask how any plaintiffs would be able to prove such a claim through the kind of "direct evidence" for which defendants are calling. Is an arbitrator going to write an opinion stating that he or she was influenced by such signals? The Court notes that circumstantial evidence is generally admissible and sees no reason why it should not be equally admissible to prove this kind of claim.[6]

Further, because a jury will never know what motivated an arbitrator to reach his or her decision, the jury must apply some kind of objective standard. In effect, the jury must answer the question whether the Union's representation was so unfair that a typical arbitrator would not have been able to render a decision that did justice to plaintiffs' claims. Thus, the Court concludes that expert testimony relating to how a typical arbitrator functions is, by necessity, an acceptable form of proof. *See Bowen v. United Postal Service,* 642 F.2d 79, 84 (4th Cir.1981), *rev'd on other grounds,* 459 U.S. 212, 103 S.Ct. 588, 74 L.Ed.2d 402 (1983).

The issue before the Court at this point is whether there was sufficient evidence of record, whether circumstantial or direct, to justify the jurors' finding that the Union's conduct at the arbitration substantially undermined that process. The Court concludes that there was. The jury had the entire transcript of the four day arbitration hearing as an exhibit. In addition, as previously described, it had excerpts of that transcript highlighting particular portions. To aid the jury, three expert witnesses were called to testify as to their impressions of particular portions

---

**6.** Kroger argues that, while plaintiffs were permitted to build a case on circumstantial evidence, Kroger was denied the one piece of direct evidence that would have convinced the jury that the case was not undermined, the decision written by Arbitrator Howlett. In his opinion, which is 82 pages long, the arbitrator details his findings of fact from the arbitration hearings, thoroughly analyzes the law, and reaches two major conclusions. He concludes that Kroger was not bound by the successors and assigns clause to require Hamady to assume the contract and that Hamady was not bound as a "successor" under the contract. He also, at one point in his opinion, concludes that the Union did not breach its duty of fair representation.

The Court determined that the opinion as a whole was inadmissible under Fed.R.Evid. 403.

The opinion was excluded because it provided findings of fact based on evidence that was different than the evidence that this jury heard in court and because it detailed legal opinions on the ultimate issue in the case. The Court found that the prejudicial effect of these conclusions of the arbitrator outweighed the minimal probative value of introducing the opinion to show it was "well-reasoned." Although the opinion as a whole was inadmissible, the Court instructed counsel that, to the extent the opinion spoke specifically to an issue in controversy, the Court would consider permitting reference to that particular item of the opinion. Further, the jury was advised of the results of the arbitration, that the arbitrator ruled that Kroger did not violate the collective bargaining agreement. Instruction No. 24.

of the hearing. Further, the jury listened to the Union attorney explain why he took the actions that he did during the arbitration proceedings. The Court therefore concludes that there was sufficient evidence to support the jury's finding that the arbitration process was undermined.[7]

### D. Breach of Contract.

In Question 4, the jury was asked

Did Kroger violate the successors and assigns clause by transferring the warehouse to Hamady without requiring Hamady to assume the collective bargaining agreement as a condition of the sale?

The jury answered "yes."

Both plaintiffs and defendants took the position at trial that the "successors and assigns" clause of the Kroger contract had a plain, unambiguous meaning. Plaintiffs argued that the plain meaning of "successor" was its common meaning and that Kroger was obligated to ensure that any employer who succeeded Kroger in operating the warehouse would accept the contract. Defendants argued that the plain meaning was the shifting legal meaning of the word "successor" in the federal labor law context. Thus, to define "successor," defendants argued that the parties had to look to the relevant case law.

■ The Court determined at trial that the meaning of the successors and assigns clause was ambiguous. Thus, the interpretation of that clause became a question of fact for the jury. *See Scott v. Anchor Motor Freight, Inc.*, 496 F.2d 276 (6th Cir.), *cert. denied*, 419 U.S. 868, 977, 95 S.Ct. 126, 312, 42 L.Ed.2d 107, 271 (1974). Admittedly, the evidence presented at trial

regarding the interpretation of the clause was sparse. The Court concludes, however, that the jury's decision is supported by substantial evidence.

Although the relevant collective bargaining agreement was negotiated in 1979, the parties presented no direct evidence regarding the intent of the parties who actually negotiated that contract. Apparently, the critical "successors and assigns" language was not a subject of negotiation at that time. It appears that the successors and assigns language had remained unchanged in the Kroger-Local 406 contract since 1961. Thus, the jury was deprived of any direct evidence of the intent of the parties to the 1979 contract.

Evidence was presented, however, from which the jury could infer the intent of the parties. Kroger submitted as exhibits copies of proposals presented by the Teamsters to Kroger during negotiations on the national level in 1961 and 1964. Defendants elicited testimony suggesting that the fact that these proposals for more inclusive "successors and assigns" language were not adopted showed that the parties could not have intended the clause to apply to the kind of asset transfer that took place in this case. Plaintiffs elicited testimony explaining that it is sometimes the practice of parties negotiating a contract to incorporate into the contract a shorter clause that is understood by the parties to include the principles of the longer, proposed language.

Further, the parties produced evidence of conduct of both the Union and Kroger subsequent to negotiation of the successors and assigns clause to show how the parties

---

7. The Union again argues that the finding of the jury regarding the claims against Hamady cannot be reconciled with the Court's decision to dismiss Hamady from the suit. As discussed above, the jury was not asked to apply hindsight or to determine whether the arbitration results with respect to Hamady were correct. Essentially, the jurors were asked whether, based on the conduct of the Union at the arbitration, the arbitration process and the arbitration decision were trustworthy. Their answer was that they were not.

The fact that Hamady was dismissed is not relevant to the issue of liability, but it is relevant to the issue of damages. Because the Hamady claim was ultimately found to be meritless, plaintiffs are precluded from any recovery against Hamady for back pay. That judgment dismissing Hamady, however, does not preclude an award against the Union for consequential damages caused by the Union's failure to fairly represent the plaintiffs at the arbitration hearing. *See Wood v. International Brotherhood of Teamsters*, 593 F.Supp. 355, 358–59 (W.D.Mich. 1984).

themselves interpreted the contract. *See* 17 Am.Jur.2d *Contracts* § 250, at 643 (1964). Although these portions of evidence were subject to differing interpretations by the parties, resolution of the conflicting interpretations is a matter for the jury, not for the judge.

Finally, parties elicited testimony to aid the jury in determining what would be a reasonable interpretation in this particular context. Plaintiffs elicited testimony regarding the general purpose and effect of successors and assigns clauses. Defendants called witnesses who explained the changing meaning of "successor" in the context of federal labor law and explained why, under Kroger's proposed interpretation, the clause did not apply to a transfer of assets. *See* 17 Am.Jur.2d *Contracts* § 252, at 644–45 (1964). Thus, the Court concludes that there was sufficient evidence to support the jury's affirmative response to Question 4.

In summary, the Court finds that there was sufficient evidence to support the seven findings of the jury on the issue of liability. The motions of Kroger and Local 406 for a judgment notwithstanding the verdict are denied.

## II. MOTION FOR A NEW TRIAL

Both defendants have moved for a new trial on the grounds that two documents which had not been admitted into evidence were inadvertently sent to the jury room for use by the jury during deliberations. The Court finds that the presence of the two exhibits with the jury during deliberations amounts to harmless error and therefore denies the motions.

### A. Background

The jurors in this case were each given looseleaf notebooks in which copies of exhibits admitted into evidence were placed. Counsel agreed to this procedure prior to trial in order to assist the jury in understanding the many exhibits that would be admitted in the lengthy trial. Two sets of notebooks were given to the jury. One set contained exhibits of plaintiffs and the Union; the other set contained exhibits of the Kroger Company.

Counsel initially handed copies of the exhibits to jurors as the exhibits were admitted into evidence. During the course of trial, counsel adopted the procedure of introducing an exhibit into evidence and, instead of giving it to the jurors at that time, adding the copies to the jurors' notebooks when trial concluded for the day.

After the proofs were closed, counsel agreed that the jurors should be permitted to take the notebooks back into the jury room with them, along with the official exhibits. Although counsel and the deputy clerk examined the official exhibits, counsel agreed among themselves that it would not be necessary to examine the notebooks.[8]

**8.** Prior to instructing the jury, the following dialogue took place outside the presence of the jury:

> MR. KOLENDA: Your Honor, I think I'm representing what everyone has agreed to. We weren't quite sure when your clerk asked us this morning how we had originally proposed it. Subsequently, I think we have all agreed that it would be—no one would object, in fact, it would be a good idea administratively for the jury to take the jury books into the jury room. There is nothing in there that's not a official exhibit.
>
> Our thinking was that if they only had the official exhibits, that's one thing to be passed around six people. And while someone wants to read it, they may have to wait until someone else is finished with it. We talked about sending in one set of the jury books, but that only means two out of six can be looking at it at one time.
>
> Given the amount of things that there are to look at and the potential length of deliberations, if they have all have of them to be looking at simultaneously while talking, that may not only improve the quality of their deliberations, but it might also speed them up substantially.
>
> If I can remember correctly, we agreed that they can have all the exhibits as they were introduced, the plaintiffs' and the defendants'.
>
> MR. QUIST: That's correct.
>
> THE COURT: Mr. Smith.
>
> MR. SMITH: That's correct.
>
> THE COURT: I would leave it to counsel to insure that all of the exhibits are in those books. So to the extent that some exhibits are missing, it will be the responsibility of counsel to see they're there.

After the jury deliberated and rendered its verdict in favor of plaintiffs, the deputy clerk discovered that one of the jury notebooks in the jury room was opened to exhibit 122.1, a document that had not been admitted into evidence. Later, it was determined that exhibit 122.1 and exhibit 97, neither of which had been admitted into evidence, were contained in all six sets of notebooks that were taken to the jury room for deliberations.

### 1. *Exhibit 122.1*

Exhibit 122.1 consists of pages ten through twelve of the arbitration transcript of September 23, 1981. The entire transcript of the four day arbitration hearing was admitted into evidence early in the trial. In order to accentuate certain portions of the transcript, plaintiffs also introduced selected excerpts of the transcript, such as exhibit 122.1.

At the point in the arbitration proceeding recorded in Exhibit 122.1, the Union's attorney was examining Kenneth Wood, a plaintiff in this case. The testimony involved notes that Wood had made regarding a conversation with Fritz Wegelman, a foreman at the Kroger warehouse. Wood testified that Wegelman was speaking to him at that time "as a friend," not as a supervisor. According to Wood's arbitration testimony, Wegelman said that, if Wood continued to make trouble, "the Kroger Company could mess up [his] records and make it very difficult ever finding another job" and, knowing "how [the Teamsters' Union] could play," that he could get "hurt" by the Union.

Earlier during the trial, the Court excluded direct testimony from plaintiff Wood regarding this conversation with Wegelman. Without deciding whether the evidence was hearsay, the Court ruled that the testimony was excludable under Federal Rule of Evidence 403 because it was more prejudicial than it was probative.

Later, plaintiffs sought to introduce exhibit 122.1, the portion of the arbitration transcript detailing the same conversation. The exhibit was offered in conjunction with fifty-four other excerpts of the arbitration transcript in order to show the misconduct of the Union at the arbitration hearing. In the portion of the transcript highlighted by exhibit 122.1, counsel for the Union appears to be attempting to impeach plaintiff Wood regarding his notes of the conversation with Wegelman.

Objections were raised by both the Union and Kroger, challenging exhibit 122.1 as hearsay and as highly prejudicial, and thus excludable, under Federal Rule of Evidence 403. A sidebar conference was called and the Court took the matter under advisement. When asked for clarification on the record, plaintiffs' counsel explained that the exhibit was not being offered as substantive proof of the conversation, unless the Court determined that it was an admission attributable to Kroger. Rather, plaintiffs primarily offered it, along with the other excerpts, to show the misconduct of the Union at the arbitration. Later, counsel for Kroger made a motion to strike pages ten through twelve of the September 23 arbitration transcript, which had already been admitted into evidence without objection. On the last day of proofs, without any ruling from the Court on either the admissibility of exhibit 122.1 or the motion to strike, plaintiffs' counsel agreed that he would not refer to exhibit 122.1 during his closing arguments. Counsel did not ask the Court to rule on the pending matters before the case was sent to the jury.

### 2. *Exhibit 97.*

Exhibit 97 is a letter sent by plaintiff Wood to Robert Holmes, then vice-president of the Teamsters Joint Council 43.

MR. KOLENDA: Fine.
Just prior to sending the exhibits to the jury room, the Court addressed counsel:
THE COURT: I would ask counsel to work with the clerk to insure that the exhibits are— all the exhibits that have been duly admitted are together. To the extent that an exhibit does not get to the jury room, that will be the responsibility of counsel to insure, working with the clerk, that all exhibits are given to the jury that have been admitted.

Wood complained in the letter that he and other union members did not believe that Local 406 was fairly representing their interests. Among other things, he explained that the Local 406 attorney worked with Kroger and Hamady, against the dissident plaintiff group, to get the injunction barring the transfer of the warehouse lifted.

Plaintiffs offered exhibit 97 into evidence early in the course of the trial. When met with a hearsay objection, they withdrew the exhibit. The Court did not rule on its admissibility.

### B. Standard to be Applied

Defendants strenuously argue that, under Sixth Circuit precedent, the presence of exhibits 97 and 122.1 in the jury room created a presumption that the jury's verdict was prejudiced by those exhibits. Defendants rely on a line of cases beginning with *Stiles v. Lawrie,* 211 F.2d 188 (6th Cir.1954), which held that

[r]eceiving incompetent documents by a jury requires that the verdict be set aside, unless entirely devoid of any proven influence or the probability of such influence upon the jury's deliberations or verdict.... It is not for the court to say whether there was sufficient evidence adduced at trial to justify the finding of the jury, and that the evidence improperly received by them could have had no influence on the verdict. This is purely a matter of fact and not within the province of the court to determine, for the law has no criterion by which to know or ascertain the effect which the improper evidence may produce upon the verdict. When improper evidence, that may have prejudiced the case, has been received by the jury, the law will so presume.

*Id.* at 190.[9] *See also Overbee v. Van Waters & Rogers,* 706 F.2d 768, 771 (6th Cir. 1983); *In re Beverly Hills Fire Litigation,* 695 F.2d 207, 214 (6th Cir.1982), *cert. de-*

*nied,* 461 U.S. 929, 103 S.Ct. 2090, 77 L.Ed.2d 300 (1983).

Plaintiffs, on the other hand, argue that the standard to be applied can be no stricter than the "harmless error" standard set forth in Federal Rule of Civil Procedure 61. Rule 61 provides that

(n)o error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court, at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

The Court agrees with plaintiffs that the harmless error standard of Rule 61, rather than the *Stiles* "presumption of prejudice" test, is the appropriate standard to apply. The factor that distinguishes the *Stiles* line of cases from this case is that, in each of the *Stiles* cases, the jury obtained unadmitted evidence through juror misconduct. It did not obtain the evidence through error of the court or parties. In *Stiles* itself, one of the jurors brought into the jury room a manual published by the state highway department purporting to show speeds at which cars were traveling based on skid marks made by the cars. In *Beverly Hills Fire Litigation, supra,* a juror performed an experiment at home to assess plaintiff's theory that a fire may have been started because of faulty aluminum wiring. In *Overbee v. Van Waters & Rogers, supra,* a juror looked through his son's electric welding manual to determine what safety precautions plaintiffs should have taken.

The Court finds the distinction between juror misconduct and error by the parties

---

9. Contrary to plaintiff's argument, the Court does not believe that *United States v. Pennell,* 737 F.2d 521 (6th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 906, 83 L.Ed.2d 921 (1985), explicitly overruled *Stiles. Stiles* addressed the question of juror misconduct. *Pennell* addressed cases dealing with unauthorized communications by third parties with jurors.

to be dispositive for two reasons. The first is based on the language of Rule 61. The second is based on practical considerations.

■■■ Rule 61, by its own terms, applies only to error "by the court or any of the parties." The *Stiles* cases did not involve error of the court or parties, but misconduct of a juror. Thus, Rule 61 did not apply and a different standard was fashioned by the courts. This case, on the other hand, involves error by the parties. Thus, Rule 61 provides the governing standard and the *Stiles* cases are inapplicable.

There are practical reasons why a presumption of prejudice is appropriate in cases of juror misconduct but not in cases of error by the parties. As noted by the Sixth Circuit, other jurors are more likely to be swayed by a fellow juror's evidence than by evidence presented by the parties. *See United States v. Pennell,* 737 F.2d 521, 533 n. 11 (6th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 906, 83 L.Ed.2d 921 (1985). In this case, there is less reason to be concerned that the jurors might have given significant weight to two out of two hundred exhibits than there would be if the two exhibits had been brought into deliberations by jurors themselves. Further, if a juror brings additional evidence into the deliberative process, counsel for the parties are deprived of any opportunity to oppose the jury's reliance on that particular evidence. In this case, the parties had control at least to the extent that they had the opportunity to examine the jury notebooks before they were removed to the jury room.

The Court's conclusion that the harmless error standard, rather than the presumption of prejudice test, applies is confirmed by consideration of an analogy. The analogy assumes that the Court admitted both exhibit 97 and 122.1 over objection at trial. It assumes further that the Court determined, on a motion for a new trial, that its previous evidentiary rulings were in error. In that case, the fact that the jury had viewed the improperly admitted exhibits would not be sufficient reason to grant a new trial. There would be no "presumption of prejudice;" instead, the party moving for a new trial would have to prove under Rule 61 that the Court's failure to grant a new trial would be inconsistent with "substantial justice." If that is the result achieved when a document reaches the jury through an evidentiary error of the court, the Court sees no reason why a stricter standard should apply when the same evidence reaches the jury through the kind of inadvertence that occurred in this case.[10]

## C. Application to the Facts

■■■ Given that the appropriate standard in this case is the "harmless error" standard of Rule 61, the Court concludes that a new trial is not warranted. Exhibits 122.1 and 97 are only cumulative of the evidence that was properly before the jury. The remaining evidence was itself sufficient to support the jury's findings. Thus, denial of the motions for a new trial is not "inconsistent with substantial justice." Fed.R.Civ.P. 61.

---

**10.** A close examination of Sixth Circuit case law suggests that this distinction is appropriately drawn. In *Blackmon v. United States,* 474 F.2d 1125 (6th Cir.), *cert. denied,* 414 U.S. 912, 94 S.Ct. 252, 38 L.Ed.2d 150 (1973), the deliberating jury requested a copy of a map which had been marked for identification but not admitted into evidence. The Court, on its own motion, decided to send the map to the jury room. In that case, the Sixth Circuit did not say it was applying a "presumption of prejudice" standard. Rather, it appears that the burden of proving prejudice remained with the party who moved for a new trial. Similarly, in footnote 12 of *In Re Beverly Hills Fire Litigation, supra,* the Court considered a case much closer to the case at bar

than that discussed in the text of the opinion. Footnote 12 describes a second piece of extraneous evidence that was improperly before the jury in that case, a publication that had been ruled inadmissible as hearsay. A copy of the publication was inadvertently admitted as part of a deposition to which it was appended. In dicta, the Court noted that an "examination of the document in question convinces us that the inadvertent introduction of the document was not prejudicial as it was probably more damaging to the defendants than to the plaintiffs." Again, in a case where juror misconduct was not involved, the Sixth Circuit made no mention of a "presumption of prejudice" standard.

1. *Exhibit 122.1*

Defendants object to exhibit 122.1 because they feel the jury could have concluded from Wood's purported conversation with Wegelman that Kroger and the Union were large, powerful organizations willing to operate outside the law to achieve their aims. The Court does not agree that, when read in its entirety, exhibit 122.1 would leave such an impression with the jury. Wegelman does not appear to be speaking as a representative of Kroger, but "as a friend" of Wood. The conversation describes only his opinion of what Kroger and the Union might do to Wood. It is by no means a threat; nothing in the conversation suggests that he was speaking on behalf of either Kroger or the Union.

To the extent, however, that exhibit 122.1 is prejudicial, its prejudicial effect is diminished by the fact that the exhibit is only cumulative of other evidence that was properly before the jury. It is cumulative in two respects.

First, it is cumulative in the sense that the exact same document was already in evidence in the form of pages ten through twelve of the September 23 arbitration transcript. Because defendant Kroger never pursued its motion to strike, the complete arbitration transcript was available for the jury's perusal during its deliberations.

Second, it is cumulative in the sense that other evidence spoke to the same theme. For example, with respect to the Union, plaintiffs presented evidence that Union officials may have turned on lawn sprinklers to douse plaintiffs, that union officers were hostile toward plaintiffs in Union meetings, and that the secretary-treasurer of the Union spoke disparagingly to the press of plaintiffs' work records. Although not as strongly worded, other evidence portrayed Kroger in a similar manner. Witnesses testified that Kroger was the second largest grocery retailer in the country and that Kroger was perceived by the Teamsters as a tough opponent in the bargaining process. Moreover, some evidence suggested that Kroger worked with the Union, against plaintiffs, in facilitating the transfer of the warehouse from Kroger to Hamady.

The Court must also look to the relevance of the exhibit to the issues determined by the jury. With respect to the Union, the evidence presented by exhibit 122.1 was arguably relevant to a central issue in the case, whether the Union was acting in bad faith. Thus, the Court must examine with great care whether, given all the other evidence, the presence of exhibit 122.1 was so prejudicial as to result in substantial injustice. As discussed above, the Court concludes that it was not.

Exhibit 122.1 was not, however particularly relevant to any claim against Kroger. Kroger's good or bad faith was not an issue for the jury's determination. The jury was only asked to interpret the successors and assigns clause and decide whether Kroger had breached that clause.

2. *Exhibit 97*

Defendants argue that exhibit 97, a letter from plaintiff Wood to Robert Holmes, is a highly prejudicial, self-serving summary of hearsay and conjecture. The Court finds that the letter is not so prejudicial as to require a new trial. Plaintiff Wood, who wrote the letter, was a key witness in this case and testified for the better part of three days. In the Court's opinion, there is nothing in exhibit 97 that did not already come into evidence through Wood's direct testimony.

The Court finds that the presence of exhibits 97 and 122.1 in the jury room during deliberations was not so prejudicial as to result in substantial injustice to the parties. Accordingly, defendants' motions for a new trial are denied.