**Salvatore Joseph MARINO,
Petitioner-Appellee,**

v.

**Dan VASQUEZ, Warden, et al.,
Respondents-Appellants.**

Nos. 86–6244, 86–6333.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 7, 1987.

Decided March 9, 1987.

Thomas V. Johnston, Encino, Cal., and James McKittrick, Eureka, Cal., for the petitioner-appellee.

Patrick T. Brooks, Los Angeles, Cal., for the respondents-appellants.

Before FERGUSON, BOOCHEVER and WIGGINS, Circuit Judges.

FERGUSON, Circuit Judge:

This is an appeal by the State of California ("State") from a judgment of the Central District of California granting a conditional writ of habeas corpus to the petitioner, Salvatore Marino. The district court granted relief on the grounds that jury misconduct violated Marino's right to a fair trial under the Sixth and Fourteenth Amendments. The State also appeals the district court's order granting Marino bail pending the State's appeal. We affirm the district court order granting conditional habeas relief as to Marino's convictions for murder and attempted murder, and the order setting conditions for release on bail. We reverse the district court's grant of habeas corpus relief as to the petitioner's conviction for felony false imprisonment.

I.

In 1982, Marino was convicted of the second-degree murder of Peter Catelli, the attempted murder of Orlando Catelli, and felony false imprisonment of Peter Catelli. An earlier trial, in 1980, had resulted in a hung jury. The charges arose out of a series of incidents that occurred in the fall of 1977, involving four co-defendants and three separate trials.

In September 1977, Peter Catelli visited the petitioner's father, Angelo Marino ("Angelo"), seeking a job at his company, the California Cheese Company. Angelo told him that there were no positions open and Catelli became angry and abusive. In the first week of October 1977, Catelli wrote an extortion letter to Angelo demanding $100,000 on pain of death. Angelo contacted his friend Joseph Piazza for help in dealing with the attempted extortion. Piazza then telephoned another associate, Thomas Napolitano, in order to arrange a meeting with Peter Catelli and his father, Orlando Catelli.

On November 10, 1977, Orlando Catelli met with Angelo, Piazza, and Napolitano to discuss the extortion letter. Catelli apologized for his son's conduct, but said that he did not know his whereabouts. On November 11, 1977, the four men met again at Angelo's place of business. During the course of this meeting Peter Catelli made a series of telephone calls to the office, during one of which he demanded that Angelo meet him at a shopping center with the $100,000. Napolitano and Orlando Catelli went to the meeting place, but Peter Catelli was not there, so they returned to Angelo's office. In the course of a subsequent call, Orlando Catelli told Peter that he should come to the office to straighten things out, and read to him Piazza's instructions that he, Orlando Catelli, and his wife, Peter's mother, were to be killed. Orlando understood this to be a ruse to lure Peter to the office. Napolitano then spoke to Peter Catelli and told him that he would pick him up and bring him to the office. Marino was present in the office at this time and was introduced to Orlando Catelli. About an hour later, Napolitano returned with Peter Catelli. Angelo pointed a gun at Catelli, and Marino, who was also armed, searched him. Piazza also had a gun in his hand.

Up to this point the accounts of what happened given by those present are in substantial agreement. From this point on, the testimony of Orlando diverges in places from that of Angelo, Napolitano, and Marino. It is clear, however, that Peter Catelli was questioned about the extortion attempt and that Marino beat him. During the course of the beating, the chair on which Peter Catelli was sitting broke, and Catelli landed on the floor. Angelo told Peter that they were going to kill his father, and Piazza and Napolitano took the

elder Catelli into an adjoining office. As they left the office, Peter was sitting on the floor, leaning against the wall of the office, and Marino was standing behind a desk. Piazza told Orlando Catelli that their threat was merely an attempt to scare his son, and then fired his gun into a box containing cheese. Orlando cried out as if in response. Almost immediately Orlando Catelli heard another shot from the adjoining office. Angelo then came in and said that Peter Catelli was dead, that he had gone for the gun, that Marino had shot him, and that it was an accident. Orlando Catelli went into the office and saw his son, dead on the floor, with Marino standing near him. Orlando then received a blow to his head and a gunshot wound which caused him to fall forward onto his son's body, although again the accounts of how this happened were disputed at trial. Orlando feigned death, although he states that he did not at any time lose consciousness. Orlando was placed in the trunk of a car, with the body of Peter Catelli and the car was driven away and abandoned.

Charges were filed against Marino, Angelo, Piazza, and Napolitano. Marino was held in custody between October 12 and December 23, 1977, when he was released on bail of $500,000. A series of trials and retrials ensued. In the first trial, in July 1980, Angelo and Piazza were tried and convicted of various felony offenses, but the trial judge subsequently granted the defendant's motion for a new trial. Marino and Napolitano were tried in a second, and separate, proceeding. The jury acquitted Marino of some of the charges against him, and were unable to reach a verdict on the other counts. They acquitted Napolitano of all charges. Marino's bail was reduced to $450,000 after the second trial resulted in a mistrial because of the hung jury.

A third trial began in September 1981, with Marino, Angelo, and Piazza as co-defendants. The amended information charged in Count I that the three defendants committed the murder of Peter Catelli. In Count II Marino and Angelo were charged with the attempted murder of Orlando Catelli, and it was alleged that Marino inflicted great bodily injury upon the victim. Counts III and IV concerned only Angelo and Piazza. In Count V the three defendants were charged with felony false imprisonment of Orlando Catelli.

Angelo's case was severed, and the third trial then proceeded with Marino and Piazza as defendants. On April 19, 1982, after deliberating for nearly thirty days, a jury found Marino guilty of second-degree murder, attempted murder, and felony false imprisonment. During the course of the jury's deliberations, two incidents occurred that led Marino to move for a new trial on the basis of juror misconduct. One incident involved a juror's unauthorized use of a dictionary to define "malice," and the other concerned an out-of-court experiment conducted by another juror to test the accuracy of a defense witness's statement that a person would be incapable of firing a handgun held in a certain position.

The case was submitted to the jury on March 22, 1982. On April 7, 1982, the jurors reported to the court that they were deadlocked and that it was doubtful they would be able to reach verdicts in the case. The court, after interviewing each juror, ordered them to continue trying to reach verdicts. On April 8, 1982, juror Tracey Jones wrote a letter to the court indicating that another juror, Roger C. Jones (no relation), was not deliberating properly and that his refusal or inability to deliberate conscientiously was holding up the work of the jury. It appears that at this time Roger Jones was voting for a verdict of manslaughter on the murder charge and not guilty on the remaining counts.

In a subsequent declaration to the court, juror Roger Jones stated that prior to the final ballot the jury discussion had centered on whether Marino harbored malice, and he had stated at that time that the prosecution had not proven malice as defined in the court's instructions. During the final week of deliberations, another juror gave Roger Jones a dictionary definition of malice, handprinted on a piece of paper, which defined malice as "active or vindictive ill-will." The definition, which Roger Jones read, was different from that set forth in

the court's instructions to the jury.[1] Roger Jones, the holdout juror, further stated that he believed that he received the dictionary definition the day before he changed his vote to find Marino guilty on all other counts. The juror who supplied the additional definition confirms Roger Jones's account of what took place.

The second allegation of juror misconduct concerned an out-of-court experiment. The prosecution attempted during trial to establish that the victim, Peter Catelli, was shot in the back of the head at close range while sitting on the floor in a corner of the office in which the shooting occurred, the position in which he was last seen by his father. The defense contended that Catelli had come forward and reached for a gun lying on a credenza, whereupon Marino had shot him in self-defense. An expert witness called by the defense testified that had Catelli been in the corner, as the prosecution alleged, it would have been impossible for Marino to reach behind him and pull the trigger.

In a declaration to the court, juror Tracey Jones stated that during the trial, while visiting her ex-husband, she had experimented with a new handgun that he had just bought, to see if she could pull the trigger with the gun held in the relevant position. She stated that she could not pull the trigger and that her ex-husband said that it was because she was too weak. Holding the gun in the same position, her ex-husband repeatedly pulled the trigger. All the jurors subsequently performed a similar authorized experiment, using a plastic toy gun, during deliberations.

On the basis of these instances of jury misconduct, Marino moved for a new trial. The trial judge denied the motion, and Marino was sentenced to a term of nine years of imprisonment.

Marino appealed his conviction in the California Court of Appeal, Second Appellate Division. In an unpublished disposition, the state court concluded that although the evidence of misconduct was undisputed, Marino had not shown that it prejudiced his right to a fair trial. The California Supreme Court denied Marino's petition for a hearing, and having exhausted his state remedies, Marino filed a petition for writ of habeas corpus in federal district court.

Upon a petition for habeas corpus, the district court, adopting the report and recommendation of a United States Magistrate, concluded that the California courts had applied the wrong legal standard in deciding the constitutional issues raised by Marino's allegations of juror misconduct. The court granted conditional habeas corpus relief, ordering Marino released from custody unless the State granted a new trial within 60 days. On September 4, 1986, the district court granted the State's motion for a stay of judgment pending appeal, and the petitioner's motion for release on bail pending the appeal.[2]

The State timely appeals both the conditional writ of habeas corpus, and the bail order.

---

1. The trial court gave the following instructions on malice:

> "Malice" may be either express or implied. Malice is express when there is manifested an intention unlawfully to kill a human being. Malice is implied when the killing results from an intentional act involving a high degree of probability that it will result in death, which act is done for a base, anti-social purpose and with a wanton disregard of human life.
>
> When it is shown that a killing resulted from the intentional doing of an act with express or implied malice, no other mental state need be shown to establish the mental state of malice aforethought.

> The mental state constituting malice aforethought does not necessarily require any ill will or hatred of the person killed.
> "Aforethought" does not imply deliberation or the lapse of considerable time. It only means that the required mental state must precede rather than follow the act.
> Murder of the second degree is the unlawful killing of a human being with malice aforethought when there is manifested an intention unlawfully to kill a human being but the evidence is insufficient to establish deliberation and premeditation.

2. In its order setting conditions for Marino's release pending appeal, the court set surety of $150,000 and placed restrictions on the petitioner during his release.

## II.

The district court's decision to grant a conditional writ of habeas corpus is reviewed de novo. *Weygandt v. Ducharme,* 774 F.2d 1491, 1492 (9th Cir.1985); *Chatman v. Marquez,* 754 F.2d 1531, 1533–35 (9th Cir.), *cert. denied,* — U.S. —, 106 S.Ct. 124, 88 L.Ed.2d 101 (1985). In reviewing the district court's decision, the state court's findings of fact are entitled to a presumption of correctness under 28 U.S.C. § 2254(d). *Rushen v. Spain,* 464 U.S. 114, 120, 104 S.Ct. 453, 456, 78 L.Ed.2d 267 (1983).

The historical facts concerning the juror misconduct in this case are uncontroverted;[3] what is in dispute is the state court's conclusion that the misconduct was not prejudicial. The application of a legal standard to historical facts does not constitute a factual finding entitled to a presumption of correctness under section 2254(d). *Imbler v. California,* 424 F.2d 631, 632 (9th Cir.), *cert. denied,* 400 U.S. 865, 91 S.Ct. 100, 27 L.Ed.2d 104 (1970).[4] Rather, it is a mixed question of law and fact, and thus reviewable de novo. *Id.*

In *United States v. Vasquez,* 597 F.2d 192 (9th Cir.1979), this circuit announced the test to be used when a jury obtains or uses evidence that has not been introduced into the trial record, and concluded that an appellant is entitled to a new trial "if there existed a reasonable possibility that the extrinsic material *could* have affected the verdict." 597 F.2d at 193. In *Gibson v. Clanon,* 633 F.2d 851, 854 (9th Cir.1980), *cert. denied,* 450 U.S. 1035, 101 S.Ct. 1749, 68 L.Ed.2d 231 (1981), the court adopted the *Vasquez* "reasonable possibility" test as the constitutional standard applicable to the collateral review of state court judgments. The proper standard is "whether it

can be concluded beyond a reasonable doubt that extrinsic evidence did not contribute to the verdict." *Gibson,* 633 F.2d at 855. The burden of proving that constitutional errors are harmless beyond a reasonable doubt is on the prosecution. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Gibson,* 633 F.2d at 855.[5]

■ Neither the trial judge nor the state court of appeal applied the standard set forth in *Gibson.* The standard announced by the state appellate court was whether the trial judge's denial of the motion for a new trial should be disturbed absent a "clear showing of an abuse of discretion." The state appellate court placed the burden of establishing an abuse of discretion on the petitioner. The appellate court's conclusion that the trial judge's decision was reasonable and supported by substantial evidence also falls short of the standards required for determining whether prejudice resulted from constitutional error. The "reasonable possibility" test adopted by this circuit is more stringent, being "equivalent in severity to the harmless error rule applicable to constitutional errors under *Chapman* [*v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)]." *Gibson,* 633 F.2d at 853 (footnote omitted). The district court therefore correctly concluded that the state courts had applied the wrong legal standard in determining the petitioner's constitutional claims.

■ Applying the *Gibson* test, the district court correctly concluded that there was a reasonable possibility that the petitioner suffered prejudice as a result of constitutional errors at trial.

---

3. The U.S. magistrate did not conduct an evidentiary hearing, as the petitioner requested, as he concluded that there was no dispute as to the facts. The State expressly agreed with the magistrate's conclusion.

4. Even were the appellants correct in their assertion that the state court's conclusions as to the absence of prejudice constitute a finding of fact under 28 U.S.C. § 2254(d), the federal courts would still not be bound by those conclusions. Under 28 U.S.C. § 2254(d)(2), the presumption of correctness disappears when the fact-finding procedure of the state court is not adequate to provide a full and fair hearing. As the state courts erroneously allocated the burden of proof as to prejudice, the petitioner was denied a full and fair hearing on his claims.

5. The state apparently now concedes that *Chapman* provides the proper standard for the allocation of the burden of proof in this case.

It is well-settled that juror misconduct of the type involved in the case at bar may implicate constitutional rights guaranteed under the Sixth and Fourteenth Amendments. The unauthorized out-of-court experiment conducted by juror Tracey Jones with a third party involved the improper receipt of evidence not admitted at trial. In *Gibson,* this court held that:

> When a jury considers facts that have not been introduced in evidence, a defendant has effectively lost the rights of confrontation, cross-examination, and the assistance of counsel with regard to jury consideration of the extraneous evidence. In one sense the violation may be more serious than where these rights are denied at some other stage of the proceedings because the defendant may have no idea what new evidence has been considered. It is impossible to offer evidence to rebut it, to offer a curative instruction, to discuss its significance in argument to the jury, or to take other tactical steps that might ameliorate its impact.

633 F.2d at 853 (footnote omitted).[6] Similarly, unauthorized reference to dictionary definitions constitutes reversible error which the State must prove harmless beyond a reasonable doubt. *United States v. Kupau,* 781 F.2d 740, 744 (9th Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 93, 93 L.Ed.2d 45 (1986).

Not all instances of juror misconduct will necessarily lead to reversal, however. In *United States v. Armstrong,* 654 F.2d 1328, 1332 (9th Cir.1981), *cert. denied,* 454 U.S. 1157, 102 S.Ct. 1032, 71 L.Ed.2d 315 (1982), this court noted that in questions concerning jury misconduct the ultimate question relates not so much to their nature as to "the prejudice they may have worked on the fairness of the defendant's trial." Moreover, there is no bright line test to divide those cases involving juror misconduct that demand reversal from those that must be affirmed. *United States v. Bagnariol,* 665 F.2d 877, 885 (9th Cir.1981), *cert. denied,* 456 U.S. 962, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1982). Thus, "cases in which convicted defendants challenge their verdicts based on alleged juror misconduct require a considered review of the details and circumstances of each case." *Id.*

■ We find no merit in the State's contention that the juror's use of a dictionary to define malice actually increased the burden on the prosecution, and could not therefore result in prejudice to the petitioner. A juror using the dictionary definition could have convicted Marino if he found ill-will alone, without applying the remaining elements of the legal definition of malice, as set forth in the instructions to the jury.[7] The State's argument that the dictionary definition increased the prosecution's burden is based on the assumption that it was added to the definition contained in the jury instructions rather than substituted for it. That assumption is necessarily speculative. It is uncontroverted, however, that the juror who received the dictionary definition had held out against a verdict of guilty of murder for nearly thirty days, but changed his vote to guilty shortly after receiving the definition.[8]

6. In *Gibson,* a juror consulted an encyclopedia to confirm his belief that a particular blood type was rare, in a case involving evidence establishing the blood types of both the victim and the defendant. Another juror consulted a medical encyclopedia to gauge the effect of a particular dosage of morphine. The court held that the jurors' resort to extrinsic evidence was constitutional error.

7. The dictionary definition of malice as "active or vindictive ill-will" differed materially from the trial court's instruction on malice, which was taken from California Jury Instructions Criminal (CALJIC) § 8.11. The substitute definition included no consideration of the element of intent for the purpose of express malice, nor did it reflect the factors that constitute implied malice, where a killing results from an intentional act involving a high probability that it will result in death, and is done for a base antisocial purpose, and with a wanton disregard of human life. Both the concepts of express and implied malice were set forth fully in the trial court's instruction.

8. In an affidavit to the trial court, Roger C. Jones stated that he believed he received the dictionary definition the day before he changed his vote. Ernest Johnson, the juror who supplied the definition, said it happened either one or two days before Jones changed his vote.

Nor do we find merit in the State's argument that the out-of-court experiment could not have prejudiced the petitioner as any conclusions drawn from that experiment could not have differed materially from conclusions drawn from the authorized experiment performed in the jury room at the behest of the parties and the court. The State's argument ignores the participation in the out-of-court experiment of a nonjuror, whom the defense could neither confront nor cross-examine. In short, the State's arguments as to both incidents of misconduct are insufficient to meet its burden of proving that the error was harmless beyond a reasonable doubt.

Previous decisions of this court have identified various factors reflecting or rebutting the existence of prejudice in cases involving incidents of jury misconduct. These decisions support our conclusion that the State has failed to make the necessary showing of lack of harm. In *Bayramoglu v. Estelle,* 806 F.2d 880 (9th Cir.1986), this court listed five factors to consider in adjudicating challenges based on the introduction by a juror of extrinsic material:

(1) whether the material was actually received, and if so how; (2) the length of time it was available to the jury; (3) the extent to which the juror discussed and considered it; (4) whether the material was introduced before a verdict was reached, and if so at what point in the deliberations; and (5) any other matters which may bear on the issue of the reasonable possibility of whether the extrinsic material affected the verdict.

*Id.* at 887 (citing *Paz v. United States,* 462 F.2d 740, 746 (5th Cir.1972), *cert. denied,* 414 U.S. 820, 94 S.Ct. 115, 38 L.Ed.2d 52 (1973)). In *Gibson,* the court noted that although the State's case against the petitioner's was strong, the failure to rebut prejudice from jury misconduct was underlined by the fact that the jury deliberated for a long time, nine hours. In the case at bar, the jury deliberated for twenty-eight days and only were able to reach unanimity after the holdout juror received the dictionary definition. *See also Bulger v. McClay,* 575 F.2d 407, 411 (2d Cir.) (jury's difficulty in reaching a verdict supported a

finding of actual prejudice resulting from the jury's discussion of extraneous evidence), *cert. denied,* 439 U.S. 915, 99 S.Ct. 290, 58 L.Ed.2d 263 (1978).

In *United States v. Bagnariol,* 665 F.2d 877 (9th Cir.1981), *cert. denied,* 456 U.S. 962, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1982), this court observed that reversible error commonly occurs where there is a direct and rational connection between the extrinsic material and a prejudicial jury conclusion, and where the misconduct relates directly to a material aspect of the case. *Id.* at 885. As to the dictionary definition, the record here supports the conclusion that there was both a direct connection between the extrinsic material and the jury's verdict, as evidenced by the holdout juror's change of verdict, and misconduct relating to a material aspect of the case, the definition of the element of malice. The concept of malice goes to the very heart of the deliberative process of a jury in a murder case. In the case at bar the presence or absence of malice was pivotal, as there were no issues as to mistaken identity, causation, or diminished capacity. Similarly, the unauthorized out-of-court experiment with the gun relates to the defense theory of self-defense, which was a material element in this trial for murder. There is a rational connection between the kind of extrinsic evidence introduced, relating to the credibility of a defense of self-defense, and a verdict of guilty of second degree murder.

Thus, we find that as to the jury's verdict on the counts of murder and attempted murder, the extrinsic evidence resulting from the two incidents of jury misconduct related to issues "material to the guilt or innocence of the defendant" and that the connection between the extraneous information and the verdict was not of the kind that "arises only by irrational reasoning." *Bagnariol,* 665 F.2d at 885, 886. The connection between the extraneous material and the jury's verdict of guilty as to the charge of felony false imprisonment is not, however, a direct and rational one under the *Bagnariol* criteria. We therefore conclude that habeas corpus relief should

be limited to the petitioner's convictions for murder and attempted murder.[9]

The State argues that this court should allow the state court the opportunity to make further findings on the issue of prejudice. There is, however, no cognizable theory on which the case should be remanded to the state trial court to make a new determination. The exhaustion requirement is satisfied when, as here, the federal claim has been fairly presented to the state courts. *Picard v. Connor,* 404 U.S. 270, 275–76, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971); *Hudson v. Rushen,* 686 F.2d 826 (9th Cir.1982), *cert. denied,* 461 U.S. 916, 103 S.Ct. 1896, 77 L.Ed.2d 285 (1983). Throughout the state proceedings, petitioner has asserted the claim that he presented to the district court—that the legal standard to be applied to his assertions of constitutional error is that set forth in *Vasquez* and *Gibson.* Nor are there any factual allegations that were not before the state courts, *Schiers v. California,* 333 F.2d 173 (9th Cir.1964); and no intervening change in federal law has cast the legal issues presented to the State in a fundamentally different light, *Blair v. California,* 340 F.2d 741 (9th Cir.1965).

We therefore affirm the district court's order granting conditional habeas corpus relief, as to the petitioner's convictions for murder and attempted murder. We reverse the granting of habeas relief as to the petitioner's conviction for felony false imprisonment.

### III.

Although we reverse the district court's grant of habeas relief as to the false im-

prisonment conviction, the two-year sentence imposed for that count was stayed pending the completion of the other sentences. We do not know what the state court will decide regarding that stay of sentence. Accordingly, we must review the district court's grant of bail.

■ The district court's determination that bail is available to a state prisoner granted conditional habeas corpus relief in federal court is a question of law, and thus reviewable *de novo. See United States v. McConney,* 728 F.2d 1195, 1201 (9th Cir.) (en banc) *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).[10]

The federal court's authority to release a state prisoner on recognizance or surety in the course of a habeas corpus proceeding derives from the power to issue the writ itself. *Ostrer v. United States,* 584 F.2d 594 (2d Cir.1978); *In re Wainwright,* 518 F.2d 173, 175 (5th Cir.1975); *United States ex rel. Thomas v. New Jersey,* 472 F.2d 735 (3d Cir.), *cert. denied,* 414 U.S. 878, 94 S.Ct. 121, 38 L.Ed.2d 123 (1973); *Woodcock v. Donnelly,* 470 F.2d 93, 94 (1st Cir.1972).

■ The release on bail of state prisoners seeking habeas corpus relief in federal court is, however, governed by Fed.R. App.P. 23, and not by the provisions of the Bail Reform Act, 18 U.S.C. § 3142, to which the district court referred for guidance. As the Third Circuit noted in *Thomas:*

> Substantial confusion has arisen ... from the reference.... to an enlarge-

---

9. The fact that conviction on the count of false imprisonment may be valid does not mean that habeas corpus relief is unavailable as to the convictions for murder and attempted murder. As the Third Circuit noted in *United States ex rel. Hickey v. Jeffes,* 571 F.2d 762, 765 (3d Cir. 1978), the district court has the statutory authority under section 2244(b) to relieve a defendant from the collateral consequences, whatever they may be, of an unconstitutional conviction, even though it would not disturb a sentence which is substainable on other counts. *See Ex parte Hull,* 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941) (a conviction may be challenged in a habeas corpus proceeding even if the petitioner would not be released if he prevailed).

10. Even though the order setting conditions of bail is interlocutory, it is appealable as a collateral order. *See Cherek v. United States,* 767 F.2d 335, 336–37 (7th Cir.1985); *Iuteri v. Nardoza,* 662 F.2d 159, 161 (2d Cir.1981) (bail order giving relief collateral to the underlying proceeding, and not subject to meaningful review on appeal from the habeas corpus determination, may be treated as final). Even though we now decide the merits of the petition for habeas corpus relief, the bail issue is not moot. The State may decide to seek a stay of mandate pending further proceedings or to petition for certiorari. The issue is therefore capable of repetition yet evading review. *See Martin v. Solem,* 801 F.2d 324, 329 (8th Cir.1986).

ment of a habeas corpus petitioner on "bail." The standards for release and for bail set forth in 18 U.S.C. §§ 3142–3152 and Rule 46 Fed.R.Crim.P..... are irrelevant to the release by federal courts of state prisoners. They deal with federal criminal proceedings only. The only authority for the release by a federal court of a state prisoner is the habeas corpus statute, 28 U.S.C. §§ 2241–2255. The power to enlarge a state prisoner at any time before a habeas corpus judgment becomes final, then, exists, if at all, as a part of the courts' habeas corpus jurisdiction.

472 F.2d at 742.

Previous decisions in this circuit reflect the confusion that the court in *Thomas* notes. In *Gilmore v. California*, 364 F.2d 916 (9th Cir.1966), this court denied an application for bail by a state prisoner appealing the district court's denial of his habeas corpus petition ordering that "[n]othing in the Bail Reform Act ... requires us to grant bail in such cases." *Id.* at 919. However, another case, *Benson v. California*, 328 F.2d 159 (9th Cir.1964), was decided without reference to the federal bail statute, under Rule 49 of the Supreme Court Rules,[11] and the court noted in *Kelly v. Springett*, 527 F.2d 1090 (9th Cir.1975) (in the context of a proceeding under section 42 U.S.C. § 1983), that the Bail Reform Act "applies only to federal prisoners." *Id.* at 1093.

Decisions of other circuits clearly establish that Rule 23 is the standard which governs a federal court's release on bail of a state prisoner seeking federal habeas corpus relief. *See Thomas; Cherek v. United States*, 767 F.2d 335, 337 (7th Cir.1985); *Woodcock*, 470 F.2d at 94; *Baker v. Sard*, 420 F.2d 1342, 1343 n. 3 (D.C.Cir.1969).

■ Even though the district court used the provisions of an inapplicable statute as a guideline in making its determination, it

acted within its authority in ordering petitioner's release on bail. This court may affirm the district court on any ground finding support in the record, *Smith v. Block*, 784 F.2d 993, 996 n. 4 (9th Cir.1986), even if the district court relied on the wrong grounds or wrong reasoning, *Bruce v. United States*, 759 F.2d 755, 758 (9th Cir.1985).

Rule 23 establishes the authority of the federal courts to release both successful and unsuccessful habeas petitioners pending appeal. The rule states:

> Rule 23. Custody of Prisoners in Habeas Corpus Proceedings.
>
> . . . .
>
> (b) **Detention or Release of Prisoner Pending Review of Decision Failing to Release.** Pending review of a decision failing or refusing to release a prisoner in such a proceeding, the prisoner may be detained in the custody from which release is sought, or in other appropriate custody, or may be enlarged upon the prisoner's recognizance, with or without surety, as may appear fitting to the court or justice of appeal or to the Supreme Court, or to a judge or justice of either court.
>
> (c) **Release of Prisoner Pending Review of Decision Ordering Release.** Pending review of a decision ordering the release of a prisoner in such a proceeding, the prisoner shall be enlarged upon the prisoner's recognizance, with or without surety, unless the court or justice or judge rendering the decision, or the court of appeals of the Supreme Court, or a judge or justice of either court shall otherwise order.

Thus, whether a petitioner granted a conditional writ falls within the scope of 23(b) or 23(c), Marino's release pending appeal was properly within the scope of the district court's authority.[12]

---

11. Rule 49 is identical in language to Rule 23, promulgated in 1967.

12. Since the district court's order was not explicitly based on the authority of Rule 23, this panel need not reach the issue of whether 23(b) or 23(c) governs the case of a petitioner granted a conditional writ, as both subparts allow for

release pending appeal. The language of 23(c) appears to establish a presumption in favor of release. *See Thomas, supra,* 472 F.2d at 743. While this presumption is not present in 23(b), that section nevertheless clearly establishes the court's authority to order release "as may appear fitting."

The district court granted bail after considering the risk of flight, the risk of danger to the community and the fact that a denial of bail could leave the petitioner without any remedy, given the State's appeal of the order granting conditional habeas relief and the length of time remaining to be served on the petitioner's sentence.

The State concedes that the petitioner does not pose a flight risk, but argues that the petitioner's propensity to violence makes his release on bail inappropriate. The district court's factual findings concerning the potential danger to the community are entitled to a deferential standard of review. *United States v. Motamedi*, 767 F.2d 1403, 1405 (9th Cir.1985) (pre-trial detention). Whether those factual determinations support the order is reviewed de novo. *Id.*

▇ The district court's findings of fact as to the petitioner's potential danger to the community are not clearly erroneous. The court noted that the petitioner was released on bail prior to his state conviction; that there was no evidence that the family of the homicide victim or any other reputed victim of assault objected to the petitioner's release; that although the victim's family was in protective custody, there was no evidence that the reason for the custody was protection from the petitioner; that two allegations of assault committed while in prison do not rise to the level of a danger to the community at large (noting the special conditions and tensions that may produce prison violence); and that in general the State's arguments as to dangerousness were replete with "conclusory language and unjustified assumptions." Taken as a whole the district court's factual determinations support the order setting conditions of bail, and we therefore affirm.

AFFIRMED IN PART; REVERSED IN PART.