Bertha E. MAYHUE, Plaintiff–Appellant and Cross–Appellee,

v.

ST. FRANCIS HOSPITAL OF WICHITA, INC., Defendant–Appellee and Cross–Appellant.

Nos. 90–3341, 90–3366.

United States Court of Appeals, Tenth Circuit.

July 9, 1992.

James S. Phillips, Jr. of Phillips & Phillips, Chartered, Wichita, Kan., for plaintiff-appellant and cross-appellee.

Alexander B. Mitchell, II of Klenda, Mitchell, Austerman & Zuercher, Wichita, Kan., for defendant-appellee and cross-appellant.

Before MOORE and EBEL, Circuit Judges, and ALLEY, District Judge.*

EBEL, Circuit Judge.

In this civil rights action, we examine whether the district court's decision to grant the defendant's motion for a new trial because of the jury's unauthorized use of dictionary definitions during its deliberations constitutes reversible error. We cannot find abuse of discretion on the record before us, and accordingly we affirm the decision of the district court.

## I. BACKGROUND

In 1982, Bertha Mayhue, a black woman, brought a race discrimination action in the United States District Court for the District of Kansas against her employer, St. Francis Hospital of Wichita, Inc. ("St. Francis"), under 42 U.S.C. § 1981[1] and 42 U.S.C. § 2000e-2(a).[2] Mayhue alleged that St. Francis engaged in racial discrimination when it (a) failed to promote her to food director in 1970 on account of her race, (b) failed to reemploy her on account of her race when its school of nursing closed in 1980, and (c) failed to employ her as food service director in 1983 on account of her race. Furthermore, she alleged, the hospital engaged in unlawful retaliation when, as a result of her complaints of racial discrimination, it (d) failed to reemploy her

---

* The Honorable Wayne E. Alley, District Judge, United States District Court for the Western District of Oklahoma, sitting by designation.

1. At the time Mayhue brought this action, 42 U.S.C. § 1981 provided:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

This section was subsequently recodified as 42 U.S.C. § 1981(a).

2. 42 U.S.C. § 2000e-2(a) provides:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

when the school of nursing closed in 1980 and (e) failed to employ her as food service director in 1983.

In October 1986, a jury entered a verdict in favor of Mayhue as to claims (a), (b), and (d) and in favor of St. Francis as to claims (c) and (e). The jury awarded damages of $200,000, as well as employee benefits for 1970 to mid–1973. In January 1987, the district court found in favor of St. Francis with respect to Mayhue's Title VII claims.

The controversy in this case arises from the jury verdict. The jury instructions generally instructed the jury that it "must consider only the evidence which is admitted by the court." Memorandum and Order (Jan. 12, 1987), Appellant's App. at 38, 44. Therefore, when the jury during its deliberations requested a dictionary, the court specifically denied that request. After the jury returned its verdict, however, the court's staff found a handwritten note in the jury room that contained definitions of the words "discriminate," "p[re]judice," "administer," "clinical," and "hypertension."[3] *Id.* at 40.

The two definitions that the court relied upon in granting a new trial were:

P[re]judice—an opinion formed without taking time and care to judge fairly[,] to damage, harm, injury as by some action that weakens a right or claim.

Discriminate—to see or note a differ[e]nce

to make or see a differ[e]nce between

to constitute a differ[e]nce between

*Id.*

The court conducted an evidentiary hearing to determine the effect of this note in accordance with Federal Rule of Evidence 606(b), which provides that "a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror." The hearing revealed that the foreperson of the jury wrote the note and read the definitions aloud to the jurors the day they rendered their decision.[4] This timing is important because the jury had reported twice during its preceding day of deliberations that it had reached a stalemate and was plagued by irreconcilable differences.[5] Yet within hours after the foreperson read the definitions on the note, the jury was able to reach a verdict.[6] Although some jurors testified that they did not remember having seen or heard these definitions, the district court found that "at least four members of the jury were in possession of evidence not offered at trial." Memorandum and Order (Jan. 12, 1987), Appellant's App. at 41.[7]

---

**3.** We do not focus on the latter three definitions due to their insignificance in a racial discrimination context. We agree with the district court that their interjection into the jury deliberations was harmless error.

**4.** Although the record is silent concerning the origin of the definitions, the district court and the parties assumed that the foreperson utilized a dictionary in drafting the note. *See* Memorandum and Order (Feb. 23, 1987), Appellant's App. at 46. We make the same assumption, but agree with the district court that origin is "immaterial[ ] because[,] regardless of the private source of the handwritten definitions, it remains clear that the jury was presented [with] extraneous prejudicial information." *Id.*

**5.** The day before the jury reached its verdict, the jury reported: "We have agreed on one out of the five questions and are stal[e]mated on the rest (four). Please advise as to further instructions." Memorandum and Order (Jan. 12, 1987), Appellant's App. at 38. The court then read the *Allen* instruction to the jury. The problems continued. Later, the jury asked: "We

have irreconcilable differences. There is no way to resolve them. How long do we brow beat the opposite view." *Id.* With the agreement of counsel, the court called the jurors in to discharge them. When asked whether further deliberations would be fruitful, however, the jurors conferred with each other and informed the court that they wished to continue their deliberations. The jury recessed for the evening.

**6.** The jury returned for deliberations at 9:00 a.m. on October 30 and returned a verdict at approximately 11:45 a.m.

**7.** During the Rule 606(b) hearing, foreperson Bush testified that she read the definitions to the other jurors on the last day of deliberations and that the jury reached a verdict soon thereafter. Several jurors corroborated this by testifying that they heard the foreperson read various definitions and/or saw the note. Others testified that they neither heard the definitions nor saw the note. Prejudice may result even when all jurors were not exposed to the external

Accordingly, the court granted St. Francis' motion for a new trial.

The case was retried. In October 1990, the second jury found no discrimination or retaliation by St. Francis. Mayhue appeals, challenging the district court's decision to grant St. Francis' motion for a new trial because of juror misconduct. In the event that Mayhue's appeal is successful, St. Francis cross-appeals as to the district court's denial of its motion to dismiss and its motion for JNOV.[8]

## II. DISCUSSION

The standard of review that governs a motion for a new trial is very important, perhaps critical, to the outcome of this appeal. We review the district court's decision to grant St. Francis' motion for a new trial only for an abuse of discretion. *United States v. Day*, 830 F.2d 1099, 1106 (10th Cir.1987). Thus, we will reverse the court's decision only if we have " 'a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances.' " *United States v. Thompson*, 908 F.2d 648, 650 (10th Cir. 1990) (citation omitted) (new trial warranted where jury was exposed to prejudicial external information).

We give the trial judge wide latitude with respect to St. Francis' motion for a new trial because he was uniquely able to assess the likelihood that the extraneous information was prejudicial. *See Malandris v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 703 F.2d 1152, 1179 (10th Cir. 1981), *cert. denied*, 464 U.S. 824, 104 S.Ct. 92, 78 L.Ed.2d 99 (1983); *see also United States v. Cheyenne*, 855 F.2d 566, 568 (8th Cir.1988) ("We give substantial weight to the trial court's appraisal of the prejudicial

effects of extraneous information on the jury, since the trial judge has the advantages of close observation of the jurors and intimate familiarity with the issues at trial."); *Day*, 830 F.2d at 1106 (" 'the trial judge . . . is in the best position to evaluate the effect of the offending evidence on the jury' ") (citation omitted).

The trial judge presided over the proceedings from start to finish; thus, he knows better than we how the definitions might have diverted the jurors' attention away from the theories presented at trial and the instructions that were to govern their deliberations. He monitored the deliberations and observed the expressions and the demeanor of the jurors while they struggled to reach a decision and twice reported being deadlocked. Thus, we affirm the district court's decision to grant St. Francis' motion for a new trial because there is credible evidence in the record to support it.

Although state court decisions may be considered, the ruling on a motion for a new trial is governed by federal law. *Malandris*, 703 F.2d at 1179.

The law in the Tenth Circuit is clear. A rebuttable presumption of prejudice arises whenever a jury is exposed to external information in contravention of a district court's instructions. *See United States v. Hornung*, 848 F.2d 1040, 1044–45 (10th Cir.1988), *cert. denied*, 489 U.S. 1069, 109 S.Ct. 1349, 103 L.Ed.2d 817 (1989); *Day*, 830 F.2d at 1103. The district court must then examine the facts and circumstances of the case in order to determine whether this presumption has been overcome.

In *Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954), the

---

influence in dispute. *See Parker v. Gladden*, 385 U.S. 363, 365–66, 87 S.Ct. 468, 471, 17 L.Ed.2d 420 (1966) (per curiam).

**8.** On cross-appeal, St. Francis asks us to consider whether *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), precludes us from reinstating the jury verdict. The cross-appeal presents three issues in particular. First, do Mayhue's claims of racial discrimination, retaliation, and failure to

promote state a claim for relief under 42 U.S.C. § 1981? Second, did the trial court abuse its discretion in permitting Mayhue to amend and add a disparate treatment claim for conduct occurring in 1970? Third, was the evidence sufficient to support a verdict in favor of Mayhue as to claims (a), (b), and (d)? Because we uphold the district court's decision to grant a new trial, we need not address these issues.

Supreme Court established a rebuttable presumption of prejudice for criminal cases involving improper communication between a third party and the foreperson of the jury:

In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.

*Id.* at 229, 74 S.Ct. at 451 (citations omitted).

In *Hornung*, this Court applied the rebuttable presumption established in *Remmer* in upholding a jury verdict despite improper contact between a juror and a bank teller. While a juror was conducting routine business at his bank, a teller informed him of the defendant's illicit activities at the bank. *Hornung*, 848 F.2d at 1043–44. In the course of discussing the juror's exposure to extrinsic influences, we stated, "The trial court has broad discretion in reviewing the effect of extrajudicial information.... The presumption [of prejudice] is not conclusive, but rather can be overcome upon the government meeting its burden of establishing that the contact with the juror was harmless to the defendant." *Id.* at 1044–45 (citations omitted). We concluded that the presumption of prejudice resulting from the improper contact in that case was overcome by overwhelming evidence of the defendant's guilt. *Id.* at 1045; *see also United States v. Greer*, 620 F.2d 1383 (10th Cir.1980) (where United States Deputy Marshal engaged in extensive lunchtime conversation with several jurors regarding Federal Youth Correction Act and its effect upon sentencing, two judges agreed that a rebuttable presumption of prejudice arose).

Other circuits have similarly held that a jury's exposure to extrinsic material gives rise to the rebuttable presumption of prejudice established in *Remmer*. *See, e.g., United States v. Perkins*, 748 F.2d 1519, 1533 (11th Cir.1984) ("Prejudice from extrinsic evidence is assumed in the form of a rebuttable presumption and the government bears the burden of demonstrating that the consideration of the evidence was harmless.") (citations omitted); *United States v. Hillard*, 701 F.2d 1052, 1064 (2d Cir.) ("[E]xtra-record information that comes to the attention of a juror is 'presumptively prejudicial.' But the presumption may be rebutted by a showing that the information is harmless.") (citations omitted), *cert. denied*, 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d 1318 (1983); *United States v. Bassler*, 651 F.2d 600, 603 (8th Cir.) ("Because Rule 606(b) precludes the district court from investigating the subjective effects of any extrinsic material on the jurors, whether such effects might be shown to affirm or negate the conclusion of actual prejudice, a presumption of prejudice is created and the burden is on the government to prove harmlessness.") (citations omitted), *cert. denied*, 454 U.S. 944, 102 S.Ct. 485, 70 L.Ed.2d 254 (1981), *and cert. denied*, 454 U.S. 1151, 102 S.Ct. 1018, 71 L.Ed.2d 305 (1982); *United States v. Howard*, 506 F.2d 865, 869 (5th Cir.1975) (when jurors are exposed to extrinsic matter, "prejudice will be assumed in the form of a rebuttable presumption, and the burden is on the Government to demonstrate the harmlessness ... to the defendant.") (citations omitted); *cf. Stiles v. Lawrie*, 211 F.2d 188, 190 (6th Cir.1954) (in a civil action where jury consulted a manual not in evidence, presumption of prejudice applies "unless [record is] entirely devoid of any proven influence or the probability of such influence upon the jury's deliberations or verdict.").

A trial judge will rarely be able to ascertain the actual prejudicial impact of a jury's exposure to external influences because a juror cannot testify regarding the subjective effect of such influences during a Rule 606(b) hearing. The trial judge must, therefore, confirm or rebut the presump-

tion of prejudice by objectively weighing all of the facts and circumstances of the case.

■ The following considerations are relevant in an analysis of whether the presumption of prejudice ought to be rebutted when a jury consults a dictionary or dictionary definition without authorization:[9]

(1) The importance of the word or phrase being defined to the resolution of the case.

(2) The extent to which the dictionary definition differs from the jury instructions or from the proper legal definition.

(3) The extent to which the jury discussed and emphasized the definition.

(4) The strength of the evidence and whether the jury had difficulty reaching a verdict prior to introduction of the dictionary definition.

(5) Any other factors that relate to a determination of prejudice.

In this case, the district court granted the defendant's motion for a new trial only after a careful and well-reasoned assessment of the dictionary definitions and the course of the jury's deliberations. The court first considered the importance of the terms "discriminate" and "prejudice" in a racial discrimination case and compared the definitions found in the jury room to those expressed in the jury instructions:

It is beyond question that the term "discriminate" is a term which was crucial to plaintiff's case and essential to the jury's decision. The handwritten definition of that term read to the jury [ ] is substantially different from the technical legal concept of that word in the context of a racial discrimination case, particularly as expressed in instructions 16 (elements), 18 (notice) and 20 (race as determining factor). The use of a dictionary definition of "discriminate" to elucidate established principles of law as expressed in language approved by the courts gives rise to probable misguidance.

The court is also concerned that a definition of the word "prejudice" was read to the jury. That term was not used in any of the court's instructions to the jury and reflects an attempt to impose upon the facts of the case an external standard not approved by the court or counsel.

Memorandum and Order (Jan. 12, 1987), Appellant's App. at 43–44.

The court next considered the manner in which the definitions were injected into the deliberations:

Here, the court had specifically refused the jury's request for a dictionary and had generally instructed the jury that they "must consider only the evidence which is admitted by the court," (Instr. # 2) and that they "may consider as evidence whatever is admitted in the trial as part of the record …" (Instr. # 9). Additionally, the handwritten definitions were brought into the jury room and read by the foreperson of the jury, which may have caused other jurors to place some weight on the unadmitted terms. Lastly, the handwritten definitions were read to the jury after they had twice informed the court of irreconcilable differences but before a verdict was returned.

*Id.* at 44.

On these bases, the district court concluded that the jury's unauthorized consultation of a dictionary was sufficiently prejudicial to warrant a new trial. Applying the factors delineated earlier in this opinion, we conclude that the record contains adequate evidence to support this determination.

*First,* the meanings of "discriminate" and "prejudice" are of crucial importance to the resolution of this section 1981 action. *Cf. United States v. Gunter,* 546 F.2d 861, 869 (10th Cir.1976) (in theft case, where jury consulted dictionary for a tangential word—"tacitly"—this Court refused to set

---

**9.** For a compilation of relevant cases discussing a jury's unauthorized consultation of a dictionary and their outcomes, see Jean E. Maess, Annotation, *Prejudicial Effect of Jury's Procurement or Use of Book During Deliberations in* *Criminal Cases,* 35 A.L.R.4th 626 (1985); Jean E. Maess, Annotation, *Prejudicial Effect of Jury's Procurement or Use of Book During Deliberations in Civil Cases,* 31 A.L.R.4th 623 (1984).

aside the jury verdict because "[s]uch may well have been error, but if it. be deemed error, it was most certainly harmless error"), *cert. denied,* 430 U.S. 947, 97 S.Ct. 1583, 51 L.Ed.2d 794 *and cert. denied,* 431 U.S. 920, 97 S.Ct. 2189, 53 L.Ed.2d 232 (1977).

*Second,* the dictionary definitions of "discriminate" and "prejudice" did not accurately reflect applicable law as set forth in the jury instructions.

The definition of "discriminate"—"to see or note a differ[e]nce[,] to make or see a differ[e]nce between[,] to constitute a differ[e]nce between"—was inaccurate because it was overbroad. It focused upon differential treatment but not the basis for the differential treatment. Thus, the actions of an employer who treated an employee differently for legitimate reasons such as skill or experience would fall within the foreperson's definition. The jury instructions, however, required that Mayhue had to prove that St. Francis treated her differently *because of her race.* Therefore, the foreperson's definition of "discriminate" was flawed not because it necessarily contradicted the jury instructions, but because it was incomplete. It failed to remind the jury that racially discriminatory motivation is a critical element of a section 1981 case. If a jury consults an external source and treats that source as complete, omissions in the information contained therein can be just as prejudicial as an affirmative misstatement. *See, e.g., Marino v. Vasquez,* 812 F.2d 499, 505 (9th Cir. 1987) (the Ninth Circuit found prejudicial error when a juror consulted a dictionary and considered an incomplete definition of "malice"); [10] *cf. Harold v. Corwin,* 846 F.2d 1148, 1150–51 (8th Cir.1988) (in medical malpractice action, prejudicial error occurred when district court read jury a misleading dictionary definition of "differentiated" in response to its question regarding the meaning of "poorly differentiated tumor").

The definition of "prejudice"—"an opinion formed without taking time and care to judge fairly[,] to damage, harm, injury as by some action that weakens a right or claim"—was similarly overbroad and inaccurate. The foreperson's definition encompassed both carelessly formed opinions and any actions that impair anyone's rights, neither of which necessarily violate section 1981. Furthermore, the jury instructions contained no reference to "prejudice." Thus, the jury may have self-imposed an external standard not approved by the court or counsel nor corrected by any jury instruction.

In addition, neither definition required action, but focused only on a person's mental process. The definition of "discriminate" included subjective discrimination ("to see or note a difference"), and the definition of "prejudice" included carelessly formed opinions. However, section 1981 proscribes an employer's actions, not merely its thoughts.

*Third,* the fact that the foreperson obtained and read the definitions might have caused those jurors who heard her to give the definitions undue emphasis at the expense of the jury instructions. *See Wood v. General Teamsters Union Local 406,* 603 F.Supp. 992, 1006 (W.D.Mich.1985) ("other jurors are more likely to be swayed by a fellow juror's evidence than by evidence presented by the parties") (citation omitted), *aff'd in part and rev'd in part on other grounds sub nom. Wood v. International Bhd. of Teamsters, Local 406,* 807 F.2d 493 (6th Cir.1986), *cert. denied,*

---

**10.** In *Marino,* the court held:

A juror using the dictionary definition [of "malice"] could have convicted Marino if he found ill-will alone, without applying the remaining elements of the legal definition of malice, as set forth in the instructions to the jury. The State's argument that the dictionary definition increased the prosecution's burden is based on the assumption that it was added to the definition contained in the jury instructions rather than substituted for it. That assumption is necessarily speculative. It is uncontroverted, however, that the juror who received the dictionary definition had held out against a verdict of guilty of murder for nearly thirty days, but changed his vote to guilty shortly after receiving the definition.

*Id.* at 505 (footnotes omitted).

483 U.S. 1006, 107 S.Ct. 3232, 97 L.Ed.2d 738 (1987). Similarly, the inflection in the foreperson's voice as she read the definitions and the discussion preceding their reading might have caused the jurors to place unmerited weight upon the definitions.

*Fourth,* the jury had difficulty reaching a verdict prior to the introduction of the dictionary definition. The day before the definitions were read and the verdict was reached, the jury twice reported to the court that it was deadlocked.

*Finally,* prejudice may be inferred from the timing of the verdict. The jury was able to reach a verdict less than three hours after the foreperson read the definitions, despite having been plagued by "irreconcilable differences" the night before. *See Marino,* 812 F.2d at 505 (juror's use of dictionary to define "malice" prejudiced the defendant where fellow juror who had held out against guilty verdict for nearly thirty days changed his vote to guilty shortly after receiving the definition).

A motion for a new trial on the grounds of juror misconduct is deeply rooted in the discretion of the district court. Because the record could support the presumption of prejudice that applies, we AFFIRM the district court's decision and DISMISS St. Francis's cross-appeal as moot.