**Harry M. SASSOUNIAN, Petitioner–Appellant,**

v.

**Earnest ROE, Warden of Lancaster; Attorney General of the State of California, Respondents–Appellees.**

No. 98–56747.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 13, 1999

Filed Oct. 26, 2000

As Amended on Denial of Rehearing Dec. 6, 2000.*

* Judge Thomas and Judge Wardlaw have voted to deny the petition for rehearing and Judge Silverman has voted to grant it.

# 1100

Charles M. Sevilla, Cleary & Sevilla, San Diego, California, for the petitioner-appellant.

David F. Glassman, Office of the Attorney General, San Diego, California, for the respondents-appellees.

Before: THOMAS, SILVERMAN, and WARDLAW, Circuit Judges.

Opinion by Judge WARDLAW; Partial Concurrence and Partial Dissent by Judge SILVERMAN.

WARDLAW, Circuit Judge:

Harry Sassounian appeals the denial of his petition for a writ of habeas corpus. A jury convicted Sassounian of murdering Kemal Arikan, the Consul General of the Republic of Turkey. The jury also found true the special circumstance of killing because of nationality or national origin, and Sassounian was sentenced to life in prison without possibility of parole. Sassounian challenges both his conviction and the special circumstance finding, presenting six claims. He argues that his conviction should be overturned for prosecutorial misconduct and witness perjury; and that the special circumstance finding should be overturned because of jury misconduct, an improper aiding and abetting instruction, the vagueness of the special circumstance statute, and insufficient evidence. We have jurisdiction under 28 U.S.C. § 2253, and we affirm in part and reverse in part.

## I. Jurisdiction

The Supreme Court recently held that the appellate provision enacted by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") and found at 28 U.S.C. § 2253, as amended, governs all appeals initiated after AEDPA's effective date. *See Slack v. McDaniel*, 529 U.S. 473, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000). Section 2253(c)(1) provides that "unless a ... judge issues a certificate of appealability, an appeal may not be taken to a court of appeals from" a district court's final order in a habeas case. Such certificate may issue "only if the applicant has made a substantial showing of the denial of a constitutional right," *id.* § 2253(c)(2), and must "indicate which specific issue or issues satisfy the showing" *id.* § 2253(c)(3).

■ Following our pre-*Slack* rule, the district court applied the pre-AEDPA procedures and issued a "certificate of probable cause," which does not specify the issues for appeal as required by the new section 2253(c)(3). *See Fuller v. Roe*, 182 F.3d 699, 702 (9th Cir.1999) (holding that pre-AEDPA appellate procedure applies to habeas petitions filed in the district court before the effective date of AEDPA). In this situation, *Slack* and *Schell v. Witek*, 218 F.3d 1017 (9th Cir.2000) (en banc), indicate that we should construe the notice of appeal as a request for a certificate of appealability, and issue the certificate of appealability as to the issues that satisfy the standard for issuance. *See Slack*, 529 U.S. at ——, 120 S.Ct. at 1603 ("As AEDPA applied, the Court of Appeals should have treated the notice of appeal as an application for a [certificate of appealability]."); *Schell*, 218 F.3d at 1021 n. 4 (citing *Slack* and construing a notice of appeal as an application for a certificate of appealability); *see also* Fed. R.App. P. 22 ("A

request addressed to the court of appeals may be considered by a circuit judge or judges, as the court prescribes. If no express request for a certificate is filed, the notice of appeal constitutes a request addressed to the judges of the court of appeals.").[1]

■ AEDPA authorizes a certificate of appealability "if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253. A "substantial showing" "includes showing that reasonable jurists could debate whether ... the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack*, 529 U.S. at ——, 120 S.Ct. at 1599 (quoting *Barefoot v. Estelle*, 463 U.S. 880, 894, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983)); *see Lambright v. Stewart*, 220 F.3d 1022 (9th Cir.2000) (describing AEDPA's "modest standard to proceed").

Deeming the notice of appeal to be a request for a certificate of appealability, we find that Sassounian has made a "substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), as to each of the six issues raised. *See Schell*, 218 F.3d at 1021 n. 4; *Solis v. Garcia*, 219 F.3d 922, 925–26 (9th Cir.2000). We therefore grant the request and issue a certificate of appealability as to each of Sassounian's claims.

## II. Background

This case concerns the highly publicized killing of Kemal Arikan (herein "Arikan"), the Consul General of the Republic of Turkey at Los Angeles, on January 28, 1982, in the Westwood area of Los Angeles.

The California Court of Appeal described the crime as follows:[2]

[A]s Arikan stopped at the signal light at Comstock and Wilshire, two men, each armed with a large caliber handgun, approached the vehicle (which was equipped with California "Consular Corps" license plates), one from the driver's side and the other from the passenger's side, and fired a number of rounds at Arikan from very close range. Arikan died within a very few minutes from multiple gunshot wounds to the head and chest. Following the shooting the two gunmen ran south on Comstock, deposited their weapons under a hedge and then made their escape in a grey car. Unfortunately for the defendant, these events were witnessed by a number of people.

At least three eyewitnesses made a positive identification of the defendant as one of the two men who had been seen (1) waiting on the corner a few minutes before the shooting took place, (2) standing by the passenger side of Arikan's vehicle while the shooting was going on and then, (3) running south on Comstock with his companion while stuffing a large handgun into his waistband. In addition, a fourth eyewitness followed the two men, watched them hide their guns under a hedge and drive away in the grey car. He noted the number on the license plate (California license No. 534 TER) which information was given to the police. A grey Chevrolet bearing that license number was registered to the defendant. He was arrested at about 3 p.m. that afternoon

1. Our Circuit Rules express a preference for district court consideration of requests for certificates of appealability: "The Court of Appeals will not act on a request for a certificate of appealability if the district court has not first ruled on the request." Ninth Circuit Rule 22–2(a). Accordingly, remand may be appropriate in other factual circumstances not before us. Here, however, when an intervening Supreme Court case changed the law, we agree with the Seventh Circuit's statement that it is "better to put the question to a court that has read the briefs and heard oral argument than to toss it back to a district judge who may have forgotten what the fuss is about." *Williams v. United States*, 150 F.3d 639, 641 (7th Cir.1998).

2. We must presume correct the factual findings of the California state courts. *See* 28 U.S.C. § 2254(d) (1995); *Sumner v. Mata*, 449 U.S. 539, 546–47, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981).

near his Pasadena home driving that vehicle.

*People v. Sassounian,* 182 Cal.App.3d 361, 226 Cal.Rptr. 880, 883–84 (Cal.App.1986) (footnotes omitted). The prosecution charged Sassounian with capital murder.

### A. The Prosecution's Case

#### 1. Eyewitness Testimony

The prosecution introduced the testimony of several eyewitnesses who described the murder scene and identified Sassounian as the gunman on the passenger side of the car.

One witness testified that while stopped at the light at Comstock and Wilshire, she saw two men standing on the southwest and southeast corners of the intersection, staring at each other but not crossing the street with the light. She contacted the police after she heard about the shooting and identified Sassounian in a lineup and at trial. She also identified a blue vest recovered from Sassounian's brother as clothing worn by Sassounian.

Another witness testified that while he was driving on Comstock that day he heard six shots and saw two men running down Comstock. One of the men wore a blue jacket or vest. At a lineup, this witness stated that he "believed" Sassounian was that man. He later identified Sassounian in a photo lineup and at trial. At trial the witness explained his initial hesitant identification, stating that there was a high probability that Sassounian was the man he saw.

A third witness was stopped at a red light at Comstock while driving on Wilshire when she heard shots and saw two men run away. One of them put something into his waistband. At an initial lineup, she could not identify Sassounian but when she saw the blue vest which police recovered from Sassounian's brother, she remembered that one of the men in the lineup, Sassounian, had been the man on the passenger side of the car. She later identified Sassounian in a photo lineup and at trial.

A fourth witness, who was also near the intersection at the time of the murder, heard shots and saw a man shoot a gun at the car from a slightly crouched position. She could not identify Sassounian but did identify the man on the driver's side as Krikor Saliba, a friend of Sassounian's. A fifth witness also witnessed the shooting and identified Saliba, and a sixth identified Sassounian at trial as someone who "very much resembles the man I remember seeing on the corner."

#### 2. Police Investigation and Physical Evidence

The prosecution also offered evidence obtained during the police investigation. Police followed up on the information provided by a witness who followed the gunmen and watched them run down the street, discard their guns in a hedge, and drive away in a grey car with a license plate of 534 TER. The police searched the hedge and retrieved a .45 caliber pistol and a 9 millimeter pistol. They matched the license plate to a grey Chevrolet registered to Sassounian at his residence in Pasadena. The police also observed Krikor Saliba, who was identified as the other gunman, at Sassounian's home, but failed to apprehend him. The police arrested Sassounian after finding him driving the grey Chevrolet near his home.

That evening, police searched Sassounian's home and retrieved clothing and additional guns. The police also spoke with Sassounian's brother, who gave them the blue vest. A police officer later testified that Sassounian's brother told him that both he and his brother had "bad feelings toward the Turkish people." At trial, the brother denied making this statement.

The police performed gunshot residue tests on Sassounian and found residue on his left hand, a finding consistent with having recently fired a gun. Hydroxy guinoline tests were negative, indicating only that Sassounian could have been holding a metal object. Experts found no fingerprints on the guns. However, tests of the Chevrolet produced fingerprints of both Sassounian and Saliba.

A firearms expert testified that the bullets found in Arikan's body were consistent with those test-fired from the recovered guns, that the .45 caliber pistol was fired from the passenger side of the car and that the 9 millimeter pistol from the driver's side. Over the defense's objection, the expert expressed his opinion that the assassins had used a "stall man" tactic, in which one person stands in front of the victim's car to slow it down and allow for more accurate shooting.

### 3. Sassounian's Confession

The prosecution introduced the testimony of Jeffrey Busch, a jailhouse informant, that Sassounian confessed to the crime. Busch testified that as an inmate "trusty," within the jail, he talked to Sassounian, who told Busch that he committed the crime. Busch testified that he was selling candy and cigarettes to other inmates when a man identified himself as Sassounian and asked for help with his case. According to Busch, Sassounian explained that he worked for the Justice Commandos for the Armenian Genocide, a terrorist organization, and that he and two partners killed Arikan in a political assassination to "get revenge on what the Turkish people did to his people." Another inmate, Danny Gruytch, testified that he saw Busch and Sassounian talking but that when he heard that they were discussing a murder he decided he did not want to get involved.

### B. The Defense's Case

Sassounian's counsel argued that the police had the wrong man. Three witnesses testified that they could not identify Sassounian as the gunman. A fourth, Judith Jones, stated positively that Sassounian was not the man who had been on the southeast corner of Comstock and Wilshire. Three alibi witnesses who knew Sassounian testified that they had seen him in Pasadena around the time of the murder.

Sassounian's counsel also vigorously attacked Busch's credibility. The defense questioned whether Busch was a trusty, whether he would have had access to a high-profile murder suspect like Sassounian, and whether Sassounian would have confessed to a stranger. Charles Laughlin and two other inmates testified that Busch fabricated Sassounian's confession and that he was a notorious liar. Laughlin explained that he gave Busch newspaper clippings and the names of two Armenian acquaintances to help him fabricate the story. The defense also introduced evidence that Busch's version of the assassination was incorrect on several matters. Busch incorrectly identified Tejerian and Yeghoian, the names that Laughlin testified he had provided, as the names of Sassounian's partners. Busch also incorrectly stated that the assassination took place in Century City, near the former location of the Turkish consulate. The defense speculated that Busch got the address from an out-of-date phone book.

Sassounian did not testify.

### C. Jury Deliberations and Verdict

In the guilt phase, the jury deliberated for fifteen days. On January 4, 1984, the last day of deliberations, the jury sent a note to the court:

> If the defendant was not the actual killer with the gun, but was involved in the crime, can he be considered to have killed the victim as stated in the special circumstance of nationality and country of origin in that he was a Turkish National?
>
> Also if we can agree on a verdict, but cannot agree on any of the special circumstances, what would our procedure be?

Answering the second question, the court stated that if the jury could not agree on the special circumstances, they should return a verdict addressing only the issue of guilt. To address the first question, the prosecutor then suggested that the court give an additional aiding and abetting instruction. The judge did not give the requested instruction. Instead, he stated on the record that he was unsure what the

jury meant by the first question. He then returned the jury to the jury room to resume its deliberations at 2:40 p.m. At 3:50 p.m. on the same day, the jury returned its verdict.

The jury found Sassounian guilty of first degree murder and also found true the special circumstance of murder because of nationality or national origin, but did not reach a verdict on the other special circumstance—lying in wait, see Cal.Penal Code § 190.2(a)(16)—or on the charge that the defendant had used a gun in the commission of the crime, see id. § 12022.5.

Following receipt of the verdict, the jurors were excused to return for the penalty phase on January 10. Late that day or early the next, juror Dylane Rankins sent a note to the judge which read:

> Your Honor, is it too late to change my vote on one of the special circumstances? On Wednesday, 4th, I was ill. I was unable to think clearly because of my illness and the pressure from the other jurors. Now my sickness is over, except for the coughing. I can think clearer. I feel I have made an error. Also based on some evidence that was brought out in our deliberations that wasn't evidence brought out in court.

After receiving the note from Rankins, the court interviewed each juror. Several of the jurors stated that during deliberations, a juror mentioned a phone call made to the Turkish Consulate threatening or taking credit for the assassination of the victim.

During the trial, the prosecution had attempted to introduce evidence that a UPI reporter received a phone call on January 28, 1982, from an individual who took credit for the assassination on behalf of the Justice Commandos for the Armenian Genocide. After argument at sidebar, the trial judge had excluded the testimony and the UPI reporter never testified.

When asked what her note meant, Juror Rankins testified that the jury was deliberating about the nationality special circumstance and the related instruction. She testified:

> And it stated in the instruction ... that if there were no other reason that you can say why the defendant did kill the Turkish Consul because of his nationality, that you should go for the most reasonable reason.... Well, I had doubt in the beginning about that based on Busch's testimony. And I kept that doubt for quite a while, but until this statement was brought up, which sort of changed my mind.

In response to the court's question as to what statement she was referring to, Juror Rankins further testified:

> Well, one of the jurors mentioned that there was a phone call made to the Turkish Consulate concerning a threatening call and said why would there be other reasons, assuming the call. At the time I was really sick and I guess I just wanted to kind of go home. So it was a lot of pressure. So I said, you know, I couldn't think of any other reason why, even though there was doubt.... But after realizing, now that my sickness is over, and I can think clearer, that I don't believe that the evidence was brought out in court. And this is what I made my decision on, on that statement.

When interviewed by the court, three other jurors—Kennelly, Castillo and Walker—recalled discussion of the phone call during deliberations but the remainder did not. Juror Kennelly said she remembered the introduction of evidence of the phone call having to do with publicity for the assassination. It may be that Juror Kennelly overheard the sidebar argument at which the call was ruled inadmissible.[3] See People v. Sassounian, 226 Cal.Rptr. at

**3.** There is no question that a lengthy and contentious side bar took place inside Department No. 133 of the Los Angeles Superior Court following District Attorney Rubin's statement that "the People call James Doyle." The colloquy occupies ten pages of trial transcript and includes defense counsel, Mr. Geragos, walking away, asking "How long does this have to go on?" Ms. Rubin proffered the testimony of Mr. Doyle, a UPI reporter, who was to testify that approximately fifteen min-

913 (Johnson, J., concurring in part and dissenting in part). Juror Castillo, the foreman, remembered that someone had mentioned the phone call after the jury had asked the question about being unable to agree on a special circumstance. According to Juror Castillo, "we felt that since it wasn't mentioned in court, it wasn't something we could elaborate on."[4]

The trial judge, without explanation, declared "there was no jury misconduct." At the conclusion of the penalty phase, the jury returned a verdict of life without possibility of parole.[5]

### D. Procedural History

The California Court of Appeal affirmed Sassounian's conviction and sentence. *See People v. Sassounian*, 182 Cal.App.3d 361, 226 Cal.Rptr. 880 (Cal.App.1986). Justice Johnson dissented in part, arguing that the juror misconduct should result in a reversal of the special circumstance finding. *Id.* at 913–22 (Johnson, J., concurring in part and dissenting in part).

Sassounian filed a state habeas petition, based in part on a declaration from Busch in which he recanted his testimony about Sassounian's jailhouse confession. The state responded with a later declaration from Busch reversing his recantation. The Court of Appeal denied relief.

Sassounian filed a similar petition in the California Supreme Court. The Supreme Court remanded the case to the Court of Appeal to address whether Sassounian's petition should be granted based on the new information about Busch's testimony.

The Court of Appeal appointed a referee, who held an evidentiary hearing and found Busch's trial testimony credible. The Court of Appeal affirmed. Justice Johnson again dissented and questioned whether the referee "adequately performed the mission he was assigned." The Supreme Court affirmed in a published opinion, stating that even if Busch's trial testimony was not credible, the error was harmless because he was vigorously impeached by Sassounian's counsel and overwhelming evidence supported the conviction. *See In re Sassounian*, 9 Cal.4th 535, 37 Cal.Rptr.2d 446, 454, 887 P.2d 527 (Cal.1995).

Sassounian then filed this federal habeas petition in district court. Although Magistrate Judge Eick recommended that relief be granted because of jury misconduct, Judge Byrne denied the petition in full. This appeal followed.

### III. Discussion

■ We review the district court's denial of a habeas petition de novo. *See Spivey v. Rocha*, 194 F.3d 971, 974–75 (9th Cir.1999). Because Sassounian filed his petition before April 24, 1996, the operative date of AEDPA, we look to pre-AEDPA precedent to assess the merits of his petition. *See Lindh v. Murphy*, 521 U.S. 320, 327, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

### A. Guilt Phase Issues

#### 1. Prosecutorial Misconduct

■ Sassounian argues that his conviction must be overturned because of prose-

---

utes after the killing, he received an anonymous phone call from someone who took credit for being a Justice Commando for the Armenian Genocide for the Arikan assassination. Ms. Rubin sought to introduce this testimony to link this supposed co-conspirator, who admitted to being a Justice Commando, to Mr. Sassounian. It was also intended to reinforce confidential informant Busch's earlier testimony that "defendant told him that he was a member of the terrorist group called The Justice Commandos." In view of Juror Kennelly's testimony, the record speaks loud and clear as to the source of the extrinsic evidence.

**4.** *But see infra* pp. 1109, where it is shown that this statement by Juror Castillo was made with reference to a different phone call—not the one which was the subject of the juror misconduct.

**5.** Under the applicable California law, first degree murder carried a penalty of death, life without possibility of parole, or twenty-five years to life. *See* Cal.Penal Code § 190 (1982). In a first degree murder case in which the jury found true the special circumstance, the law required that the penalty be either death or life without possibility of parole. *See id.* § 190.2(a).

cutorial misconduct. A habeas petition will be granted for prosecutorial misconduct only when the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)); *see Bonin v. Calderon,* 59 F.3d 815, 843 (9th Cir.1995).

The prosecutorial misconduct allegations fall into three categories. First, Sassounian argues that the prosecutor intentionally introduced the expert's testimony about the stall man tactic without foundation. The prosecutor represented to the trial court that a subsequent witness would provide foundation for the expert's stall man theory, i.e. testimony that one of the gunmen stood in front of the car. The trial judge allowed the testimony over defense objection. The foundational witness, however, failed to testify to the predicate fact. The prosecutor conceded that she had made an honest mistake in introducing the stall man evidence. Sassounian argues this was intentional misconduct because the prosecutor knew from the foundation witness's preliminary hearing testimony that she would not provide foundation for the expert's opinion.

Second, Sassounian argues that the prosecutor asked improper questions of defense witness Laughlin. Laughlin, who served time in prison with Busch, testified that he helped Busch fabricate a story about Sassounian. Because Laughlin's testimony contradicted every part of Busch's testimony, he was a crucial defense witness. During Laughlin's cross-examination, the prosecutor several times accused him of being a liar. At one point she retorted, "isn't that because nobody believed your information?" She also inquired whether he had a grudge against the police because they "proved he was a liar," and referred to "when we found out about your lies." The trial judge sustained an objection and informed the prosecutor that she should not testify.

Sassounian's third allegation regarding prosecutorial misconduct is that the prosecutor told the jury that the defense counsel made up evidence. Saliba's sister identified his car and stated that the license plate, 534 TER, was not the proper plate. Defense counsel, noting that the getaway car was missing the front license plate, argued that Saliba had put the missing license plate on his car and that Saliba's car, not Sassounian's, was in fact the getaway car. The prosecutor argued that this was a "trick," implying that Sassounian's counsel had set up the photograph.

■ None of the prosecutor's actions rose to the level of a due process violation. In light of the other evidence supporting the conclusion that the murder was an assassination, the stall man evidence added little to the prosecution's case. Evidence that the assailants used a particular technique tends to indicate that it was an assassination, not a murder in the course of some other crime. But this fact did not specifically implicate Sassounian, nor did it shed light on his motive. Furthermore, because other witnesses testified that the first shots were fired from in front of the car, the prosecution may have had sufficient foundation despite the foundation witness's failure to testify as expected.

■ Many of the prosecutor's comments on Laughlin's lying were appropriate in context, in response to Laughlin's admissions that he lied. *See Greer v. Miller,* 483 U.S. 756, 765–66, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987) (noting importance of viewing alleged misconduct in context). The prosecutor did stray beyond proper advocacy during the trial by, for example, introducing her own opinion that Laughlin was a liar and implying that defense counsel had fabricated evidence. The trial judge, however, correctly sustained several objections to the alleged misconduct. *Cf. United States v. Sarkisian,* 197 F.3d 966, 988 (9th Cir.1999) (stating "the defendants fail to show that they were prejudiced because the district court sustained the defendant's objection and struck the an-

swer"). The judge also instructed the jury that lawyers' comments and argument are not evidence. *Cf. id.* Furthermore, the misconduct was isolated to a few points in the trial. *Cf. Hall v. Whitley,* 935 F.2d 164, 165–66 (9th Cir.1991) ("Put in proper context, the comments were isolated moments in a three day trial."). We cannot say that prosecutorial misconduct deprived Sassounian of a fair trial.

### 2. Witness Perjury

■ Sassounian also argues that his conviction should be overturned because Busch fabricated the entire story about his meeting with Sassounian, and that the prosecution knew about at least some of Busch's lies. Perjury by a government witness requires a new trial "if there is a reasonable probability that [without the evidence] the result of the proceedings would have been different." *Franklin v. Duncan,* 884 F.Supp. 1435, 1456 (N.D.Cal. 1995), *adopted on appeal,* 70 F.3d 75, 76 (9th Cir.1995) (quoting *United States v. Young,* 17 F.3d 1201, 1203–04 (9th Cir. 1994)). Sassounian's petition should be granted if perjury "undermines confidence in the outcome of the trial." *United States v. Bagley,* 473 U.S. 667, 678, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

As the California Supreme Court noted, Busch "was apparently dubious on the circumstances" of Sassounian's confession and "wrong on several matters" "[a]s to the substance." *In re Sassounian,* 37 Cal. Rptr.2d at 449, 887 P.2d 527. There were questions about whether he would have had access to Sassounian, a high-profile prisoner in relatively tight custody, and whether he was a trusty. Busch incorrectly testified that the assassination took place in Century City, the previous location of the Turkish consulate. Busch also stated that the assassins used 9 mm pistols, when one gunman in fact used a .45 caliber gun. In addition, Busch identified Sassounian's partners as "Tejerian" and

"Yeghoian," individuals who had no connection to the crime but who had been acquaintances of Laughlin.

In a June 1991 declaration, Busch recanted all of his testimony. He stated that he had fabricated the story with help from a fellow inmate and that he had never had any contact with Sassounian. He stated that a police detective filled him in on the details of the case, and also gave him money, bought him a car, and promised to help him with his case. In October 1991, however, Busch recanted his recantation and stated in another declaration that he had testified truthfully at trial.

The government contends that this court must defer to the factual findings of the California Court of Appeal. On habeas review, we must presume correct "a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties." 28 U.S.C. § 2254(d) (1995). The California Court of Appeal, adopting the referee's report, found that Busch was credible in his trial testimony. The court also found that the government witnesses were credible when they testified that they did not make promises to Busch or suppress evidence. The California Supreme Court, however, did not address the factual findings made by the Court of Appeal. *See In re Sassounian,* 37 Cal.Rptr.2d at 456, 887 P.2d 527. Rather, the Supreme Court found that, even if Busch fabricated his testimony, the error was harmless because Busch's testimony was vigorously impeached already and overwhelming evidence supported Sassounian's guilt as to the special circumstance finding. *See In re Sassounian,* 37 Cal.Rptr.2d at 455, 887 P.2d 527.[6]

■ The district court, relying on a Fifth Circuit case, *see Craker v. Procunier,*

---

**6.** The Supreme Court also criticized the referee for including "inflammatory or immaterial" findings in his report, but did not comment on whether the conclusions in the

report were supported by the record. *See In re Sassounian,* 37 Cal.Rptr.2d at 450, 887 P.2d 527.

756 F.2d 1212, 1213–14 (5th Cir.1985), deferred to the findings made by the Court of Appeal. We need not decide, however, whether section 2254(d) requires deference when one state court makes factual findings and a higher state court affirms the case without relying on the findings. Instead, we agree with the California Supreme Court that there is not a reasonable probability that, without Busch's testimony, the result would have been different.

The prosecution produced strong evidence of Sassounian's guilt. As the district court concluded:

> [T]he trial evidence overwhelmingly established petitioner's guilt on the first degree murder charge. The deletion of Busch's testimony, or a more effective impeachment of this testimony, would have changed nothing. Multiple eyewitnesses positively identified petitioner. Another eyewitness watched the shooters hide their guns and drive away in a car exhibiting petitioner's license plate. The recovered guns fired the bullets that killed the victim. Testing revealed gunshot residue on petitioner's hand.

In short, without Busch's testimony, there is not a reasonable probability that the result would have been different.

### B. Special Circumstance Issues

#### 1. Jury Misconduct

■ Sassounian contends that the jury's consideration of facts not in evidence invalidated the special circumstance finding. Juror misconduct is a mixed question of law and fact, reviewed de novo. *See Rodriguez v. Marshall,* 125 F.3d 739, 744 (9th Cir.1997).

■ A juror's communication of extrinsic facts implicates the Confrontation Clause. *See Jeffries v. Wood,* 114 F.3d 1484, 1490 (9th Cir.1997) (en banc). The juror in effect becomes an unsworn witness, not subject to confrontation or cross examination. *See id.* The government concedes, and the California Court of Appeal found, that "the reference to [the] phone call introduced into the deliberations a matter which was not admitted into

evidence and as such constituted jury misconduct." *People v. Sassounian,* 226 Cal. Rptr. at 900. Thus, the only issue before us is whether the error was harmless; that is, whether the extrinsic information had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993); *cf. Bains v. Cambra,* 204 F.3d 964, 977 (9th Cir.2000) (stating "we now join the vast majority of our sister circuits by deciding that the *Brecht* standard should apply uniformly in all federal habeas corpus cases under § 2254").

■ Before turning to the merits, we must determine what evidence may be considered in evaluating the jury's consideration of the improper evidence. Federal Rule of Evidence 606(b) provides that:

> [A] juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention....

A long line of precedent distinguishes between juror testimony about the consideration of extrinsic evidence, which may be considered by a reviewing court, and juror testimony about the subjective effect of evidence on the particular juror, which may not. *See, e.g., Rodriguez,* 125 F.3d at 744; *Dickson v. Sullivan,* 849 F.2d 403, 406 (9th Cir.1988) ("the question of prejudice is an objective, rather than a subjective, one"); *United States v. Bagnariol,* 665 F.2d 877, 884–85 (9th Cir.1981) ("Jurors may testify regarding extraneous prejudicial information or improper outside influences. They may not be questioned about the deliberative process or subjective effects of extraneous informa-

tion, nor can such information be considered by the trial or appellate courts."); *Rushen v. Spain,* 464 U.S. 114, 121 n. 5, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983); *Mattox v. United States,* 146 U.S. 140, 149, 13 S.Ct. 50, 36 L.Ed. 917 (1892). As Justice Johnson noted, having to ignore the most direct evidence of prejudice—Rankins' testimony that she relied on the extrinsic information—lends an "Alice in Wonderland quality to the discussion of whether [Sassounian] was actually prejudiced by the admitted jury misconduct." *People v. Sassounian,* 226 Cal.Rptr. at 914. Nevertheless, the weight of authority and sound policy reasons support this view. *See, e.g., McDonald v. Pless,* 238 U.S. 264, 267–68, 35 S.Ct. 783, 59 L.Ed. 1300 (1915) (noting that finality of verdicts supports the rule). Therefore, although we may consider testimony concerning whether the improper evidence was considered, we may not consider the jurors' testimony about the subjective impact of the improperly admitted evidence. Even with this limitation, however, analysis of the relevant factors compels the conclusion that the fact that four jurors recalled discussing the phone call, when and how it occurred, the nature of the extrinsic evidence it introduced into the deliberations and the weakness of the trial evidence bearing on the special circumstance, had a "substantial and injurious effect or influence" on the special circumstance finding.

 "There is no bright line test for determining whether a defendant has suffered prejudice from an instance of juror misconduct." *Rodriguez,* 125 F.3d at 744 (9th Cir.1997). However, "we place great weight on the nature of the extraneous information that has been introduced into deliberations." *Id.* (citing *Jeffries,* 114 F.3d at 1490). We have identified the following factors as relevant to the inquiry: (1) whether the material was actually received, and if so, how; (2) the length of time it was available to the jury; (3) the extent to which the juror discussed and considered it; (4) whether the material was introduced before a verdict was reached, and if so at what point in the deliberations; and (5) any other matters which may bear on the issue of the reasonable possibility of whether the extrinsic material affected the verdict.

*Dickson,* 849 F.2d at 406 (quoting *Marino v. Vasquez,* 812 F.2d 499, 506 (9th Cir. 1987)). We have also pointed to other factors that "might nonetheless suggest that the potential prejudice of the extrinsic information was diminished in a particular case." *Jeffries,* 114 F.3d at 1491. These include:

[1] whether the prejudicial statement was ambiguously phrased; [2] whether the extraneous information was otherwise admissible or merely cumulative of other evidence adduced at trial; [3] whether a curative instruction was given or some other step taken to ameliorate the prejudice; [4] the trial context; and [5] whether the statement was insufficiently prejudicial given the issues and evidence in the case.

*Id.* at 1491–92 (footnotes omitted).

Here, there is no doubt the jury received the improper evidence. Four jurors testified that the phone call taking credit for the killing came up during deliberations. Although other jurists in the long course of these proceedings have been quick to note that Juror Castillo testified that the phone call was mentioned but not considered, a close reading of that testimony reveals that Juror Castillo was not referring to the same phone call, i.e., the call to the Turkish embassy claiming credit for the Arikan assassination. Rather, Juror Castillo was referring to another telephone call related to a map drawn by informant Busch, which contained references to actions taken against Turkish government properties. During the map discussions, the jurors spoke of "the incidents that were written down there, that somebody had called up and claimed responsibility for those."

 Moreover, at least two jurors, Rankins and Kennelly, testified that they thought the call had been received into

evidence. Although only two, or possibly three, jurors remembered hearing about the improper information, "[t]he number of jurors affected by the misconduct does not weigh heavily in the prejudice calculus for even a single juror's improperly influenced vote deprives the defendant of an unprejudiced, unanimous verdict." *Lawson v. Borg,* 60 F.3d 608, 613 (9th Cir.1995); *see Dickson,* 849 F.2d at 408 ("If only one juror was unduly biased or improperly influenced, Dickson was deprived of his sixth amendment right to an impartial panel."); *Dyer v. Calderon,* 151 F.3d 970, 973 (9th Cir.1998) ("The Sixth Amendment guarantees criminal defendants a verdict by impartial, indifferent jurors. The bias or prejudice or even a single juror would violate Dyer's right to a fair trial."); *United States v. Gonzalez,* 214 F.3d 1109 (9th Cir.2000); *Tinsley v. Borg,* 895 F.2d 520, 523–24 (9th Cir.1990) ("Even if only one juror is unduly biased or prejudiced, the defendant is denied his constitutional right to an impartial jury.") (internal quotations omitted); *Harrington v. California,* 395 U.S. 250, 254, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969) (recognizing that "we must reverse if we can imagine a single juror whose mind might have been made up because of Cooper's and Bosby's [inadmissible] confessions and who otherwise would have remained in doubt and unconvinced"); *United States v. Delaney,* 732 F.2d 639, 643 (8th Cir.1984) ("If a single juror is improperly influenced, the verdict is as unfair as if all were.").

▮▮▮ The timing of the jury's discussion of the improper evidence was critical. After fifteen days of deliberations, at 1:55 p.m. on January 4, the jury asked what it should do if it could agree on a verdict but could not agree on any of the special circumstances. The jury was sent back to the jury room at 2:40. It was during the next hour, before the verdict was returned at 3:50 p.m., that the jury discussed the phone call as the reason the Turkish Consul was killed. Without even considering Juror Rankins' statement that the phone call is what caused her to stop holding out on the special circumstance finding, the timing of this pivotal information alone compels the conclusion that it was not harmless. Lengthy deliberations preceding the misconduct and a relatively quick verdict following the misconduct strongly suggest prejudice. *See Marino,* 812 F.2d at 505 (granting petition when jury returned verdict shortly after juror, who had held out for thirty days, considered improper evidence). But even more compelling is the fact that the evidence was discussed in response to Juror Rankins' question based on the jury instruction about the "most reasonable reason" for the killing. The improper phone call "evidence" thus supplied the "reasonable reason" Juror Rankins needed to convict.

The very nature of the improper evidence also suggests that it prejudiced Sassounian. The government argues that unlike in other cases granting relief, the extrinsic information did not directly implicate the defendant. *See Jeffries,* 114 F.3d 1484 (petition granted where jury learned about defendant's prior criminal record); *Lawson v. Borg,* 60 F.3d 608 (9th Cir.1995) (petition granted where jury improperly told that defendant was violent); *Jeffries v. Blodgett,* 5 F.3d 1180, 1191 (9th Cir.1993) (petition granted where jury learned that defendant had committed prior armed robbery); *Dickson,* 849 F.2d 403 (petition granted where jury told that defendant had committed a similar crime); *Marino v. Vasquez,* 812 F.2d 499 (9th Cir. 1987) (petition granted where juror did experiment testing whether she could fire a gun in a particular position). A review of the government's cases, however, reveals that the improperly considered evidence here was even more damaging. Unlike the evidence of prior bad acts found prejudicial in those cases, the evidence of the phone call supplied an element of the very issue being deliberated.

The phone call directly related to Sassounian's motive, which was at issue in the special circumstance for which he was convicted. *Cf. Rodriguez,* 125 F.3d at 744 (stating that reversible juror misconduct

usually relates "directly to a *material aspect* of the case" (emphasis added) (citing *Bagnariol,* 665 F.2d at 885)). Three jurors testified to the same phone call—this phone call could only have been the one discussed during the lengthy and contentious side bar described in footnote 3. In her proffer, the state prosecutor represented that the UPI reporter received a phone call which named the Justice Commandos for the Armenian Genocide as the organization taking credit for the crime. Thus, the call specifically pointed to a nationality-based motive. This reference was all the more significant because it corroborated Busch's testimony that Sassounian committed the crime for the Justice Commandos, the same group mentioned in the call. Thus, the phone call not only powerfully suggested that the killers acted based on the nationality of the victim, but also rehabilitated Busch's thoroughly impeached testimony about Sassounian's confession to a political killing.

It cannot be said that the other evidence amassed at trial was so overwhelming that the jury would have reached the same result even if it had not considered the extraneous material. Although the jury did hear other evidence related to the special circumstance, all of it was either circumstantial or challenged at trial. The prosecution presented Sassounian's brother's statement that he and his brother had bad feelings for Turkey, Busch's testimony about Sassounian's membership in an Armenian terrorist organization, and evidence that Arikan traveled in an official limousine with diplomatic license plates. However, on the stand, the brother denied making the statement about his feelings about Turkey. In addition, vague expressions of ill will are not nearly as probative as a definite statement taking responsibility for the killing on behalf of an anti-Turkish terrorist organization. Because the defense vigorously cross-examined Busch and introduced evidence that he was a notorious liar, Busch's credibility was suspect. As Justice Johnson explained, Busch's "testimonial thread" was "tattered." *People v. Sassounian,* 226 Cal. Rptr. at 917 (Johnson, J., concurring in part and dissenting in part). Finally, Ari-

kan's official status, revealed by license plates reading only "Consul Corps," does not specifically implicate Sassounian. By contrast, the phone call not only demonstrates that the killers targeted Arikan because of his nationality, but also directly connects Sassounian to the crime and the special circumstance motivation by corroborating Busch's testimony that Sassounian killed Arikan while working for the Justice Commandos for the Armenian Genocide. Because the phone call provided significant probative evidence of a nationality-based motive of Sassounian, it reasonably could have had a profound effect on the jury.

Finally, the judge never had an opportunity to diminish the prejudicial effect of the extraneous information. Because he did not know that the jury found out about the phone call until after the verdict, the jury was never told not to consider it.

We therefore conclude that jury misconduct had a "substantial and injurious effect" on the special circumstance finding. We believe that the dissent misapplies the "substantial and injurious effect" test to the facts presented here. Rejecting the standard established in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the Supreme Court in *Brecht* imported the harmless-error standard of *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), into review of habeas petitions. In *Kotteakos,* the Court explained the application of the substantial and injurious effect test:

> if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. *The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error.* It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

*Kotteakos,* 328 U.S. at 765, 66 S.Ct. 1239 (emphasis added). Here, when all is said and done, these simple facts remain: after

fifteen days of deliberation the jury was hung on each of the special circumstances. Then, in response to Juror Rankin's searching question for the "reason" for the killing, the improper extrinsic evidence was introduced into the deliberations. Within one hour, the jury found true the special circumstance of murder because of nationality or national origin but hung on each of the other charged circumstances.

We "cannot say, with fair assurance, after pondering all that happened without stripping" from the deliberations the improper introduction of the Justice Commandos phone call, that the special circumstance verdict was not substantially swayed by the error. *Id.* Thus "it is impossible to conclude that substantial rights"—the difference between life and life without the possibility of parole "were not affected." *Id.* By reciting a list of "evidence" to reach the conclusion that "Arikan was killed because of his nationality," *see infra* at 13544 (Silverman, J., dissenting), the dissent not only improperly places itself in the role of the jury, it disregards *Kotteakos'* admonition that "the inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error." *Id.* We therefore reverse the district court as to the special circumstance.

### 2. Other Issues Related to the Special Circumstance Finding

Because we find that juror misconduct warrants relief on the special circumstance finding, we need not address Sassounian's arguments that the special circumstance finding should be invalidated because of an improper aiding and abetting instruction,[7] the vagueness of the special circumstance statute, or lack of sufficient evidence.

### IV.

As to the conviction, we AFFIRM the district court. As to the special circumstance finding, we REVERSE the district

court, and remand for proceedings consistent with this disposition.

SILVERMAN, Circuit Judge, concurring in part and dissenting in part:

I concur in most of Judge Wardlaw's excellent opinion, but respectfully disagree with the majority's analysis of the harmfulness of the jury misconduct. The question is whether the petitioner has carried his burden of proving that the phone call incident had a *substantial and injurious* effect on the verdict. It is not enough to show that it may have had *some incidental* effect. I agree with the district judge that the petitioner has not met the burden imposed by *Brecht.*

For starters, as Judge Byrne pointed out, the alleged phone call did not mention the petitioner at all. It is not altogether clear exactly *what* the jurors heard about the call, but the majority quotes the testimony of juror Dylane Rankins, who said, "Well, one of the jurors mentioned that there was a phone call made to the Turkish Consulate concerning a threatening call and said why there would be other reasons, assuming the call." Juror Kennelly testified ". . . that there had been a phone call for publicity. I don't know who they phoned. . . . But it was something to do with publicity."

That's it. *That is all the record shows that the jurors heard about the call to the Turkish Consulate.* The insinuation that the jurors must have overheard a sidebar summary of the proposed testimony of a UPI reporter is utter speculation wholly unsupported by the jurors themselves.

This case is not like those, for example, in which a jury was improperly informed of the *defendant's own* prior criminal record, *Jeffries v. Wood,* 114 F.3d 1484, 1491 (9th Cir.1997), or told that the *defendant himself* has a history of violence, *Lawson v. Borg,* 60 F.3d 608, 612 (9th Cir.1995). As Judge Byrne found, at most

---

**7.** Although Sassounian asserts that the conviction should be overturned based on in-

structional error, he confines his argument to the special circumstance finding.

[t]he alleged phone call relates only to facts that were not in dispute at trial. The phone call purported to be either a threat about a future assassination, or the taking of responsibility for the assassination after the fact. It did not purport to say why the assassination would or did occur, nor who participated in the actual assassination. The fact that Arikan was assassinated was not in dispute, nor was the fact that he was a Turkish national and the Consul General. The call did not in any way relate to whether the petitioner participated in the assassination and if so, what his motive might have been. The call had no connection to the petitioner. Thus, the reference to the alleged phone call is similar to juror misconduct that has not resulted in the granting of the habeas petition.

Order Denying Petitioner's Motion, September 8, 1998 at 33 (citations omitted).

In determining whether the momentaneous mention of the phone call likely had a substantial and injurious effect or influence in determining the jury's verdict as required by *Brecht*, it is essential to view it in the context of the entirety of the case. The majority says that the evidence concerning the special circumstance was less than overwhelming. With all due respect, I suggest that there was a mountain of mostly undisputed evidence that Arikan was killed because of his nationality:

- Petitioner previously expressed his hatred for the Turkish people.
- Arikan was a Turkish national and diplomat.
- Arikan drove a car bearing the distinctive "Consul Corps" license plate.
- The two assailants pre-positioned themselves on either side of an intersection in Arikan's usual course of travel and awaited his arrival.
- When Arikan's car arrived at the intersection, he immediately was ambushed by the two men, assassination style.
- There was no evidence of a personal relationship between Arikan and petitioner, no attempt to rob or kidnap, and no evidence of any other motive.

When this compelling evidence is stacked up against the fleeting mention of a cryptic phone call, the conclusion is clear: The phone call incident cannot be found to have had a substantial and injurious effect on the jury's verdict as required by *Brecht*. This case was a whodunit, not a whydunit. The petition was, in my view, correctly denied in all particulars, and therefore, I respectfully dissent from the portion of the majority's decision granting relief with respect to the finding of special circumstances.